795 F.2d 549
 Lawrence E. JOSEPH and R. Frank Joseph, Plaintiffs-Appellants,
v.
L. Brooks PATTERSON, Richard Thompson, David Case,
individually and in their capacities as Oakland County
Prosecutors; James A'Hearn and Robert Leon, individually
and in their capacities as members of the Oakland County
Prosecutor Office Investigation Division and/or of the
Oakland County Organized Crime Strike Force; Jointly and
Severally, Defendants-Appellees.
 No. 84-1332.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 16, 1986.
Decided July 2, 1986.
Rehearing and Rehearing En Banc Denied Aug. 19, 1986.
 
 Hugh M. Davis, Jr. (argued), Detroit, Mich., for plaintiffs-appellants.
 Janice G. Hildenbrand (argued), Southfield, Mich., Ronald Holton, Troy, Mich., for defendants-appellees.
 Before JONES and NELSON, Circuit Judges and PECK, Senior Circuit Judge.
 JOHN W. PECK, Senior Circuit Judge.
 
 
 1
 Lawrence and R. Frank Joseph appeal the district court's dismissal of their complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. The Josephs brought this action under 42 U.S.C. Sec. 1983 against three county prosecutors and two investigators employed by the county prosecutor's office for alleged civil rights violations.[1] The issue on appeal is whether the district court erred in finding that dismissal was required by Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), in which the Supreme Court held that a prosecutor is immune from a Sec. 1983 damages suit for alleged civil rights violations committed "in initiating a prosecution and in presenting the State's case." Id. at 431, 96 S.Ct. at 995. For the reasons stated below, we reverse the district court's judgment and remand this case to the district court for further proceedings consistent with this opinion.
 
 I.
 
 2
 For purposes of evaluating a motion to dismiss pursuant to Rule 12(b)(6), we must regard the factual allegations in the complaint as true. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 174-75, 86 S.Ct. 347, 348-49, 15 L.Ed.2d 247 (1965); Windsor v. The Tennessean, 719 F.2d 155, 158 (6th Cir.1983), cert. denied, --- U.S. ----, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). The claim should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957); Windsor, 719 F.2d at 158. The Josephs allege the following material facts derived from the joint pre-trial statement and certain paragraphs of their complaint expressly incorporated into the pre-trial statement. These facts are not well developed in the record, and are disputed by appellees, who include the Oakland County (Michigan) Prosecuting Attorney, Brooks Patterson; his chief assistant Richard Thompson; assistant prosecuting attorney, David Case; Chief of the Prosecuting Attorney's Investigative Division, James A'Hearn; and A'Hearn's investigator, Robert Leon.
 
 
 3
 Starting as early as 1978, A'Hearn and Thompson expressed the belief that the Josephs were allied with organized crime and wanted to "get" them. As a result, appellees entered into a concerted action with the police to bring false criminal charges against the Josephs, as evidenced by a series of events all of which occurred March 14, 1980. George Joseph, a younger brother, was involved in an altercation during the early morning hours of March 14 with an acquaintance, Hal Morrow. Morrow filed a complaint against George Joseph alleging felonious assault and extortion. Morrow was contacted by Lawrence Joseph regarding payment for the damages he had suffered from George Joseph's acts. At the behest of the police, Morrow secretly taped the telephone conversation with Lawrence Joseph and "played along" with Joseph in an attempt to entrap him into a criminal act. Morrow later met with Lawrence Joseph, accepted $800.00 as restitution and damages, and signed a release from claims for civil liability. Morrow then attempted to withdraw his complaint against George Joseph and initially concealed from the police his acceptance of the $800.00. The police arrested Morrow and telephoned A'Hearn, who contacted Thompson. Thompson and A'Hearn, in conjunction with the police, interrogated, intimidated, and coerced Morrow into filing false criminal charges against both Lawrence and Frank Joseph for obstructing justice and compounding a felony. Further, although a writ of habeas corpus had been issued by the 48th District Court of Michigan for George Joseph, who was still in custody, appellees ignored the writ and transferred George Joseph to the Oakland County Circuit Court for arraignment. The appellees used this opportunity to have the Circuit Court sign complaints and arrest warrants against Lawrence and Frank Joseph based on Morrow's coerced statements. These were immediately executed against the Josephs at the 48th District Court where they were waiting with George's counsel for his expected appearance on the writ of habeas corpus. The appellees had also obtained a search warrant from the Circuit Court allowing them to search Lawrence Joseph's business premises for the release executed by Morrow, the evidence of the alleged attempt to obstruct justice. However, the search, which was conducted simultaneously with the Josephs' arrests and which shut down the store during business hours, was unlawfully expanded to include a search of the entire premises for business records, contraband liquor and cigarettes which were never found. The release was, however, recovered. Appellees A'Hearn, Leon and one prosecutor were present at the search.
 
 
 4
 All charges against Lawrence and Frank Joseph were dismissed upon preliminary examination by the 48th District Court. The appellees, with knowledge of the falsity of the charges, nonetheless appealed the dismissal to the Oakland County Circuit Court, which affirmed the dismissal, and the Michigan Court of Appeals denied leave to appeal. Thereafter, appellees opposed the Josephs' efforts to have their records expunged and certain properties returned to them. Further, appellees released or caused to be released to the media derogatory information about the Josephs. Finally Chief Assistant Prosecutor Richard Thompson influenced Assistant Prosecutor Case, a permanent member of the Oakland County Concealed Weapons Licensing Board, to "flag" Lawrence Joseph's concealed weapons licensing file and to reduce his long-standing general permit to a restricted permit.[2]
 
 
 5
 Based on these alleged events, the Josephs filed the complaint in the present action on August 2, 1982, alleging violations of 42 U.S.C. Secs. 1983, 1985, and 1986, as well as pendent state claims for intentional infliction of mental distress, intentional interference with business relations, malicious prosecution, false arrest, false imprisonment, invasion of privacy, and illegal search and seizure. The appellees raised absolute immunity in their Rule 12(b)(6) motion to dismiss, which was granted by the district court on February 2, 1984, the morning of trial. In making its decision, the district court did not require an evidentiary hearing or affidavits. The district court found that the prosecuting attorneys were entitled to absolute immunity under Imbler. Although not specifying the type of immunity to be accorded investigators A'Hearn and Leon, the district court found that they too had immunity. Having thus dispensed with the federal claims, the district court also dismissed the pendent state claims. This appeal ensued.
 
 II.
 
 6
 The parties agree that Imbler controls this case, and the proper interpretation of Imbler is at the core of this dispute. In Imbler the Supreme Court extended absolute or quasi-judicial immunity to prosecutors when their "activities were intimately associated with the judicial phase of the criminal process." 424 U.S. at 430, 96 S.Ct at 994. In that case absolute immunity applied to a state prosecutor who had been accused in a Sec. 1983 action with knowing use of perjured testimony. The Supreme Court narrowly held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under Sec. 1983." Id. at 431, 98 S.Ct. at 995. The Court expressly reserved the issue of whether "similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of an advocate." Id. at 430-31, 98 S.Ct. at 994-95.[3] Notably, the Supreme Court cited and left standing several appellate court decisions which had extended only qualified or good-faith immunity to prosecutors who engaged in investigative or administrative activities. Id. at 430 n. 31, 98 S.Ct. at 995 n. 31.[4] The court further recognized:that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.
 
 
 7
 Id. at 431 n. 33, 98 S.Ct. at 995 n. 33.
 
 
 8
 The Josephs assert that the prosecutors' alleged conduct in this case--coercive interrogation of a witness, false statements to support a complaint, arrest warrants and a search warrant, participation in an unlawful search, and malicious prosecution--constituted investigative activities not protected by absolute immunity. Similarly, they charge that the prosecutor's opposition to Lawrence Joseph's general concealed weapons permit and to expungement of their records are administrative acts outside Imbler's grant of absolute immunity. The Josephs finally assert that investigators employed by the prosecutor's office, whose roles often parallel those of police officers, have only qualified immunity for their alleged acts. Appellees counter that all of the prosecutors' activities were inextricably tied to the initiation of a prosecution or were undertaken pursuant to statutory mandate and were, therefore, entitled to absolute immunity. Appellees further contend that the investigators, when functioning as members of the prosecuting attorney's staff pursuant to his directives, should also be accorded absolute immunity.
 
 III.
 
 9
 We first address the issue of the extent of prosecutorial immunity. The Supreme Court has consistently construed the liability of public officials under Sec. 1983 in light of common law immunity principles and the interests behind them. Briscoe v. LaHue, 460 U.S. 325, 334-36, 103 S.Ct. 1108, 1115-16, 75 L.Ed.2d 96 (1983); Imbler, supra, 424 U.S. at 421, 96 S.Ct. at 990; Pierson v. Ray, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).
 
 
 10
 As explained in Briscoe, which granted absolute immunity to a police officer witness who gave perjured testimony:
 
 
 11
 The central focus of our analysis has been the nature of the judicial proceeding itself. Thus, in his opinion concurring in the judgment in Imbler ... JUSTICE WHITE explained that the absolute immunity of public prosecutors was "based on the policy of protecting the judicial process." 424 U.S. at 439, 96 S.Ct. at 999. He explained ...
 
 
 12
 The reasons for this rule are also substantial. It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes ... are such that those involved in judicial proceedings should be 'given every encouragement to make a full disclosure of all pertinent information within their knowledge.' Ibid.
 
 
 13
 The common law's protection for judges and prosecutors formed part of a "cluster of immunities protecting the various participants in judge-supervised trials," which stemmed "from the characteristics of the judicial process." Butz v. Economou, 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978) ...
 
 
 14
 In short, the common law provided absolute immunity for all persons ... who were integral parts of the judicial process.
 
 
 15
 460 U.S. at 334-35, 103 S.Ct. at 1115-16. One particular justification underlying prosecutorial immunity is the need to insulate prosecutors from unfounded, retaliatory lawsuits by angry defendants; such lawsuits would deter vigorous prosecution of cases, deflect prosecutors' energies, and ultimately harm the judicial process. Imbler, 424 U.S. at 424, 96 S.Ct. at 992; Windsor, 719 F.2d at 164. Another significant justification for absolute immunity with regard to prosecutors' quasi-judicial activities is that the procedural safeguards inherent in the judicial system reduce the need for private damage actions as a means of redressing unconstitutional conduct. Butz, 438 U.S. at 512, 98 S.Ct. at 2913.
 
 
 16
 The Supreme Court has specified that in conducting immunity analysis pursuant to the foregoing common law principles and public policy considerations "immunity analysis rests on functional categories, not on the status of the defendant." Briscoe, 460 U.S. at 342, 103 S.Ct. at 1119; see Malley v. Briggs, --- U.S. ----, ----, 106 S.Ct. 1092, 1094, 89 L.Ed.2d 271 (1986) (law enforcement officer who obtained a warrant based on allegations in affidavit found not to establish probable cause was not entitled to absolute immunity); Cleavinger v. Saxner, --- U.S. ----, ---- - ----, 106 S.Ct. 496, 501-04, 88 L.Ed.2d 507 (1985) (prison disciplinary committee members not entitled to absolute immunity); Mitchell v. Forsyth, --- U.S. ----, 105 S.Ct. 2806, 2813, 86 L.Ed.2d 411 (1985) (U.S. Attorney General not absolutely immune for unconstitutional conduct in pursuit of his national security function); Butz, 438 U.S. at 513-14, 98 S.Ct. at 2914-15 (executive branch officials who initiate and participate in adjudicatory functions before administrative agencies have absolute immunity); Imbler, 424 U.S. at 430, 96 S.Ct. at 994. It is precisely as a result of this functional approach, which insulates only prosecutorial conduct that can be considered "quasi-judicial" and intimately related to the judicial process, that the Supreme Court in Imbler left standing appellate cases which did not extend absolute immunity to administrative or investigative acts of prosecutors. 424 U.S. at 430, 96 S.Ct. at 994 (citing Guerro v. Mulhearn, 498 F.2d 1249 (1st Cir.1974); Hampton v. City of Chicago, 484 F.2d 602 (7th Cir.1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); Robichaud v. Ronan, 351 F.2d 533 (9th Cir.1965); Madison v. Purdy, 410 F.2d 99 (5th Cir.1969); Lewis v. Brautigam, 227 F.2d 124 (5th Cir.1955)).
 
 
 17
 More recently, the Supreme Court implied its continuing approval of this functional distinction in observing that, since Imbler, the Courts of Appeals have generally ruled that prosecutors do not enjoy absolute immunity for acts taken in their investigative or administrative capacities, and that the Supreme Court has "at least implicitly drawn the same distinction" in its cases. Harlow v. Fitzgerald, 457 U.S. 800, 811 n. 16, 102 S.Ct. 2727, 2734 n. 16, 73 L.Ed.2d 396 (1982). Admittedly, some activities of a prosecutor, particularly those relating to the initiation of a prosecution, fall within a "gray" area not easily classifiable as solely "quasi-judicial", investigative, or administrative in nature. One synonym for "quasi-judicial" conduct that we find helpful in this regard is "advocatory." See Butz, 438 U.S. at 512, 98 S.Ct. at 2913 ("[a]bsolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment ..." (emphasis added)); Imbler, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33 ("the duties of a prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution" (emphasis added)); Gray v. Bell, 712 F.2d 490, 499 (D.C. Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984); McSurely v. McClellan, 697 F.2d 309, 319 (D.C. Cir.1982); Forsyth v. Kleindienst, 599 F.2d 1203, 1214 (3d Cir.1979). In other words, the critical inquiry is how closely related is the prosecutor's challenged activity to his role as an advocate intimately associated with the judicial phase of the criminal process. This so-called functional analysis cannot be conducted mechanistically, but must occur with an eye toward the common law and public policy underpinnings of absolute immunity. Having set forth these general principles of immunity, we consider the individual acts alleged in this case.
 
 
 18
 A. Thompson's Alleged Interrogation of Morrow
 
 
 19
 The Josephs allege that Chief Assistant Prosecutor Thompson interrogated Morrow while he was in police custody and coerced Morrow into making false statements which supported a later criminal complaint against the Josephs. Appellees contend that interviewing a witness is insulated activity, citing Forsyth in which the Third Circuit stated that granting absolute immunity to a prosecutor's decision to initiate a prosecution while subjecting him to liability for securing information necessary to that decision would be incongruous. 599 F.2d at 1215. However, while recognizing the prosecutor's need and "limited right to gather necessary information," the Third Circuit also foresaw that "this narrow exception could be distorted to include all of a prosecutor's investigative activities." Id. The court thus determined that summary disposition was inappropriate and that a factual inquiry was necessary to determine whether the securing of information was in furtherance of a decision to initiate prosecution, and was therefore quasi-judicial in nature, or whether it was in the course of supervising or conducting a law enforcement investigation. Id. at 1216. The latter may be fairly characterized "not [as] the protected decision to initiate prosecution, but rather the earlier, preliminary gathering of evidence which may blossom into a potential prosecution [and which therefore] is investigatory activity." McSurely, 697 F.2d at 320. We note that prosecutors who supervised and participated in an unconstitutional police interrogation of a criminal suspect were not entitled to absolute immunity in Robichaud, supra, 351 F.2d at 536-37. See also Wilkinson v. Ellis, 484 F.Supp. 1072 (E.D.Pa.1980); and see Rose v. Koch, 465 F.Supp. 1157, 1159 (E.D.N.Y.1979) (which distinguished interviewing witnesses to prepare testimony for proper presentation of the case from factual interviews "no different in kind from that of a police officer.") Because there are allegations which could support a finding that Thompson acted in an investigative capacity during the interview, we conclude that summary disposition was inappropriate. Remand is necessary for further development of the record on this issue before the district court can properly determine the nature and intent of the interview and whether absolute immunity should insulate Thompson from liability for this alleged act.
 
 
 20
 B. The Issuance of Complaints and Arrest Warrants Based on False Statements
 
 
 21
 Even taking as true, as we must for purposes of this appeal, the allegations that the prosecutors knowingly obtained issuance of criminal complaints and arrest warrants against the Josephs based on false, coerced statements elicited from Morrow by the prosecutors and police, we find that such conduct, however reprehensible, would be protected by absolute immunity. The decision to file a criminal complaint and seek issuance of an arrest warrant are quasi-judicial duties involved in "initiating a prosecution," which is protected under Imbler, 424 U.S. at 431, 96 S.Ct. at 995. Martinez v. Winner, 771 F.2d 424, 437 (10th Cir.1985); Lerwill v. Joslin, 712 F.2d 435, 437-38 (10th Cir.1983); Macko v. Bryon, 641 F.2d 447, 449 (6th Cir.1981) (per curiam); Hampton v. Hanrahan, 600 F.2d 600, 632 (7th Cir.1979); Smart v. Jones, 530 F.2d 64 (5th Cir.), cert. denied, 429 U.S. 887, 97 S.Ct. 240, 50 L.Ed.2d 168 (1976). To be sure there are some cases which hold that such conduct is not subject to absolute immunity either because it is viewed as investigatory activity, McSurely, 697 F.2d at 320, or because the prosecutor sought the warrant and filed the complaint out of a wholly personal motivation unrelated to his official duties, Beard v. Udall, 648 F.2d 1264 (9th Cir.1981); Brooks v. Fitch, 534 F.Supp. 129 (D.N.J.1981). However, we believe that securing the person of the defendant is part of initiating a prosecution and should be insulated. "Without the presence of the accused, the initiation of a prosecution would be futile." Lerwill, 712 F.2d at 438. Moreover, extending absolute immunity to this function is consistent with the public policy and common law considerations outlined in Imbler:
 
 
 22
 A prosecutor is duty bound to exercise his best judgment ... in deciding which suits to bring.... The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.... [A] defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate.... To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system. 424 U.S. at 424-25, 427-28, 96 S.Ct. at 992-93, 993-94.
 
 
 23
 In addition, the judicial process is available to help safeguard the ultimate interests of the accused. Indeed, in this case the charges were dismissed upon preliminary examination by the circuit court.
 
 
 24
 C. The Issuance of a Search Warrant and Participation in the Search
 
 
 25
 The Josephs allege that the prosecutors sought issuance of a search warrant at the same time they filed the complaint and requested arrest warrants. The preparation of and application for the search warrant concededly fall in the "gray" area of immunity analysis because they display characteristics of both advocatory and investigative functions. It can be argued that such "conduct is no more than 'initiating a prosecution and presenting the state's case....' " Groff v. Eckman, 525 F.Supp. 375, 377 (E.D.Pa.1981) (quoting Imbler, 424 U.S. at 431, 96 S.Ct. at 995). On the other hand it has been observed that
 
 
 26
 a prosecutor who assists, directs, or otherwise participates ... in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative capacity than in his quasi-judicial capacities of "deciding which suits to bring and conducting them in court."
 
 
 27
 Marrero v. City of Hialeah, 625 F.2d 499, 505 (5th Cir.1980) (quoting Imbler, 424 U.S. at 424, 96 S.Ct. at 992), cert. denied, 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981); see Maxfield v. Thomas, 557 F.Supp. 1123, 1129 (D. Idaho 1983) (drafting and application for search warrant which was executed after filing of a criminal complaint constituted a quasi-judicial function as opposed to a pre-complaint application and search which would have constituted investigatory conduct); see also Robichaud, 351 F.2d at 533; Lewis, 227 F.2d at 124 (both cases, cited by Imbler, supra, hold that a prosecutor may function as an investigator merely by directing police-gathering functions).
 
 
 28
 Clearly, decisions of when and how to prosecute are not made in a vacuum, so that in some cases the directing of police to secure further evidence may be necessary to and part of a decision to prosecute. However, in other circumstances such activity may be merely investigatory. Consequently, a factual inquiry is necessary in order to determine the role in which this challenged activity was conducted. Forsyth, 599 F.2d at 1215; Bushouse v. County of Kalamazoo, 93 F.R.D. 881, 884 (W.D.Mich.1982).
 
 
 29
 The Josephs also allege that an unnamed prosecutor participated in a search with the police of Lawrence Joseph's grocery store; the search was not confined to the warrant. We have no doubt that such conduct, if true, is not subject to absolute immunity. McSurely, 697 F.2d at 320; Marrero, 625 F.2d at 505; Hampton v. Chicago, 484 F.2d at 609; Maxfield, 557 F.Supp. at 1130 (citing Jacobson v. Rose, 592 F.2d 515 (9th Cir.1978), cert. denied, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979)). As simply, but succinctly, stated in Robichaud, 351 F.2d at 536:
 
 
 30
 If [a prosecutor] acts in the role of a policeman, then why should he not be liable, as is the policeman, if, in so acting, he has deprived the plaintiff of rights, privileges, or immunities secured by the Federal Constitution and laws?
 
 
 31
 Therefore, the district court erred in dismissing the case in light of the above allegations of investigatory conduct.
 
 D. Malicious Prosecution
 
 32
 The Josephs further allege that the prosecutors engaged in abuse of process and malicious prosecution. Although the factual allegations on this point are scant, presumably the prosecutors' decision to pursue the charges and to appeal their dismissal underlies this allegation. These allegations, even though undeveloped, were appropriate for summary judgment. Such activity, even if malicious and founded in bad faith, is unquestionably advocatory and at the heart of the holding in Imbler. 424 U.S. at 424, 428, 96 S.Ct. at 992, 994. Absent absolute immunity, suits for malicious prosecution or abuse of process would be a common response by defendants when the State's case fails. Id. at 421, 96 S.Ct. at 990. Such susceptibility to damages actions would inhibit prosecutors from aggressively prosecuting cases and would deflect their energies. Id. at 424-25, 96 S.Ct. at 992-93. Subsequent to Imbler, it has been held that the rationale which supports absolute immunity at the trial level applies equally to appeals. Henzel v. Gerstein, 608 F.2d 654, 657 (5th Cir.1979).
 
 
 33
 E. Restriction of Lawrence Joseph's General Concealed Weapons Permit
 
 
 34
 The Josephs allege that Chief Assistant Prosecutor Thompson influenced Assistant Prosecutor Case, a permanent member of the Oakland County Concealed Weapons Licensing Board, to investigate and reduce Lawrence Joseph's general permit to a restricted permit. They submit that such an activity is administrative and, therefore, subject only to the affirmative defense of qualified immunity. Appellees counter that the prosecutor should be accorded absolute immunity with respect to this activity, because the prosecuting attorney (or an assistant prosecutor chosen by him) is required by Mich. Comp. Laws Ann. Sec. 28.426 to sit on the county-wide three-member concealed weapons licensing board. The appellees' argument that a statutorily mandated duty should be accorded absolute immunity has some force and has been a significant factor in several cases. Mother Goose Nursery Schools, Inc. v. Sendak, 770 F.2d 668, 671 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986) (Indiana Attorney General required by state law to review state contracts is absolutely immune); Campbell v. Patterson, 724 F.2d 41, 43 (6th Cir.1983) (per curiam) (Michigan Attorney General obligated by statute to render opinions interpreting law at the request of state agencies was granted immunity for errors arising out of this function), cert. denied, 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984); Cribb v. Pelham, 552 F.Supp. 1217, 1222 (D.S.C.1982) (prosecutor's statutorily mandated duty to docket cases was accorded absolute immunity). However, the fact that a statute has mandated a duty is not dispositive in and of itself. In each of the above cases the courts expressly considered the nature of the challenged activity mandated by statute and whether it was quasi-judicial. Mother Goose, 770 F.2d at 671; Campbell, 724 F.2d at 43; Cribb, 552 F.Supp. at 1222. In all cases the acts were found to be within the individual's advocatory or quasi-judicial functions. Id.
 
 
 35
 We are not convinced that a prosecutor functions in his quasi-judicial capacity when sitting on a concealed weapons licensing board. The Michigan Supreme Court has held that concealed weapon licensing boards are not "state boards" or "agencies" subject to the provisions of the Michigan Administrative Procedures Act. Rather, they are local regulatory bodies created by state statute pursuant to the legislature's exercise of its police powers. Hanselman v. Wayne County Concealed Weapon Licensing Board, 419 Mich. 168, 196-97, 351 N.W.2d 544 (1984). Each board has exclusive authority to dispense or deny weapons permits in its county and "must determine 'proper reason' and 'suitability' [for a permit] based upon consideration of local needs and an exercise of its discretion." Id. at 189. The boards are composed of law enforcement officials [a prosecutor, police officer, and sheriff] to insure that the power to issue and revoke permits is "properly placed with those professionals most able to assess community needs and problems in this area." Bay County Concealed Weapons Licensing Board v. Gasta, 96 Mich.App. 784, 791, 293 N.W.2d 707 (1980). Further, it has been noted that the holder of a permit has only "a modicum" of interest in his permit, so that minimal procedural safeguards are required in revocation hearings. Id. at 790-91, 293 N.W.2d 707.
 
 
 36
 In view of these facts we find Cleavinger, supra, --- U.S. at ----, 106 S.Ct. at 496, instructive. In Cleavinger the Supreme Court found that a prison disciplinary committee performed adjudicatory functions in that they heard testimony, received evidence, and rendered decisions regarding inmates accused of infractions; however, the Supreme Court concluded that such activities did not rise to a " 'classic' adjudicatory" function and accorded only qualified immunity to the committee members. The Court emphasized that the committee members were not professional hearing officers, as are administrative law judges. By virtue of their professional ties to the prison, neither were they truly independent and impartial, as are state and federal judges. Further, few of the procedural safeguards of the Administrative Procedures Act were present. The Court likened the committee to the school board members in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), who "adjudicated" violations of school regulations, but who were protected only by qualified immunity. The Court observed that absolute immunity would not significantly increase the officials' ability to exercise discretion so as to warrant the absence of a remedy for persons subjected to intentional and unjust deprivations.[5] Cleavinger is consistent with the Supreme Court's earlier holding in Butz that administrative law judges who adjudicate within an administrative agency enjoy absolute immunity because their duties are "functionally comparable" to those of a judge. In Butz the presence of Administrative Procedures Act safeguards and a structure insuring the adjudicator's independent judgment on the evidence, free from outside influences, were significant factors underlying the Court's decision. 438 U.S. at 512-13, 98 S.Ct. at 2913-14.
 
 
 37
 Although the Oakland County Concealed Weapons Licensing Board does perform some "adjudicatory" functions, it does not adjudicate in the formal, "classic" sense. Moreover, as law enforcement professionals who may have had occasion to deal with some applicants, the board members cannot be said to be impartial, independent, and free from outside influences. Further, as noted by the Michigan Supreme Court, these boards are not subject to the Michigan Administrative Procedures Act, and are vested with wide discretion based on "local needs." Therefore, we conclude that only qualified immunity should be granted members of the Concealed Weapons Licensing Board, and dismissal on the basis of absolute immunity with regard to this activity was erroneous.F. The Prosecutors' Opposition to Expungement of the Record
 
 
 38
 The Josephs allege that the prosecutors' continuing opposition to expungement of their records even after losing all appeals with regard to dismissal of the charges was an administrative act not to be accorded absolute immunity. Appellees, on the other hand, urge that Prosecuting Attorney's Policy Memorandum # 38 requires routine opposition to all motions for expungement; they analogize this activity to filing an appeal or motion for a new trial. They conclude that such activity should be afforded the same absolute immunity received for trial proceedings.
 
 
 39
 Like the other issues raised on appeal, the facts are sketchy at best. In addition, it is questionable whether the prosecutor had any discretion at all, either as an administrator or advocate, to oppose expungement in light of Mich.Comp.Laws Ann. Sec. 28.243 which provides for mandatory return of records in most cases. Mich.Comp.Laws Ann. Sec. 28.243 provides in relevant part:
 
 
 40
 (2) If a person accused ... is released without a charge made against him or her, the official taking or holding an accused's fingerprints, arrest card, and description shall immediately return this information without the necessity of a request. If not returned, the accused shall have the absolute right to demand and receive the return at any time after the release and without the need to petition for court action.
 
 
 41
 (3) If an accused ... is found not guilty of the offense charged, the arrest card, the fingerprints, and description shall be returned to him or her by a court order signed by the trial court and directed to the official holding this information, which order shall issue automatically upon the finding of not guilty without the necessity of request therefor. If for any reason the order of return is not issued upon a finding of not guilty, the accused shall have the absolute right to the return, upon request, at any time after the acquittal. If the order of return is refused the accused, the accused shall have the right to petition the circuit court of the county where the original charge was made for a preemptory writ of mandamus to require issuance of the order of return.
 
 
 42
 The only exceptions to the mandatory return of the accused's record occur in cases where the person arrested has a prior conviction, aside from a misdemeanor traffic offense, or where the person arrested was charged with a sexual offense. In such cases a judge must by express order entered on the record order return. Mich.Comp. Laws Ann. Sec. 28.243(6)(a) and (b). Therefore, remand is necessary to develop the facts on this issue. If the district court develops facts indicating that the circumstances require return pursuant to the clear mandate of Sec. 28.243, clearly the prosecutors cannot be said to have engaged in advocatory conduct in furtherance of the judicial process, because there was nothing to adjudicate or advocate. On the other hand, if the facts demonstrate that due to a prior conviction a hearing or legal proceeding was conducted with regard to a motion for expungement, the prosecutors were acting as advocates representing the state's interest in the judicial process.
 
 IV.
 
 43
 Although the district court stated that investigators Leon and A'Hearn should not be accorded the same absolute immunity that prosecutors enjoy under Imbler, the court without explanation conferred upon them an unspecified form of blanket immunity: "[G]iven the facts that ... we are dealing with ... [i.e.] an investigation and then a warrant and search to get evidence to support a prosecution, I think that A'Hearn and Leon also have immunity." The Josephs raise this as their final assignment of error. The appellees, on the other hand, urge that investigators who carry out duties pursuant to the preparation of a prosecutor's case should enjoy the same immunity the prosecutor has. They contend that "it would hardly seem reasonable to exculpate the district attorney and not to immunize his underlinings," citing Atkins v. Lanning, 556 F.2d 485, 489 (10th Cir.1977). We agree to a point.
 
 
 44
 Nonjudicial officials, who need protection from claims or harassment which would interfere with their duties, ordinarily are accorded qualified immunity. See Cleavinger, --- U.S. at ----, 106 S.Ct. at 501 and cases cited therein. However, because immunity rests not on status or title, but function, nonjudicial officers are entitled to absolute immunity when they perform quasi-judicial functions. See Briscoe, 460 U.S. at 342, 103 S.Ct at 1119; Kurzawa v. Mueller, 732 F.2d 1456, 1458 (6th Cir.1984). Drawing upon this principle, a nonjudicial officer who takes ministerial actions intimately related to the judicial process pursuant to the express direction and control of a prosecutor, who is directing the activity in the fulfillment of a quasi-judicial responsibility, also has absolute immunity. Vicory v. Walton, 721 F.2d 1062, 1066 (6th Cir.1983) (Bertelsman, J., concurring), cert. denied, --- U.S. ----, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984); Atkins, 556 F.2d at 488-89; DeBoer v. Martin, 537 F.Supp. 1159, 1163 (N.D.Ill.1982). In such a situation it can be said that the official is functioning as the alter ego of the prosecutor. However, when the nonjudicial official undertakes action on his own initiative or when he carries out administrative or investigatory functions of the prosecutor, he can only claim the affirmative defense of qualified immunity. In these instances, both the public policy and common law rationale which favor absolute immunity, as well as the checks and safeguards inherent in the judicial process, are absent.
 
 
 45
 On the face of the complaint there are allegations that A'Hearn was contacted directly by the police and in turn involved the prosecutor's office in an investigation of the Josephs' alleged obstruction of justice. It is also alleged that A'Hearn and Leon participated in an unconstitutional search. Such self-initiated and investigatory activities fall outside the circumstances delineated above which warrant absolute immunity. Therefore, the district court erred in dismissing the case as to Leon and A'Hearn.
 
 V.
 
 46
 In the case of the investigators and, in some instances, the prosecutors, absolute immunity is not available; they must rely on the affirmative defense of qualified immunity. However, "[t]his less-than-absolute protection is not of small consequence." Cleavinger, --- U.S. at ----, 106 S.Ct. at 501. This is so because the test for qualified immunity is that: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. As observed in Butz, 438 U.S. at 506-07, 98 S.Ct. at 2910-11, "[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law.... [I]nsisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment." The test for qualified immunity is an objective one to be applied by the trial court as a matter of law before discovery occurs. If the law which the defendant's conduct is alleged to have violated is clearly established, then the qualified immunity defense must fail and discovery proceed. If the law is not clearly established, the defendant is immune and summary judgment is proper. Windsor, 719 F.2d at 165.
 
 
 47
 The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 48
 DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.
 
 
 49
 Although I agree with much of what the court says, I must dissent from some of it.
 
 
 50
 I agree that the prosecutors are entitled to absolute immunity from liability for obtaining the issuance of criminal complaints and arrest warrants against Lawrence and Frank Joseph, and I therefore concur in Part III B of the court's opinion. I also agree with sections D, E and F of Part III.
 
 
 51
 As Part III C of the opinion indicates, the warrant for the search of Lawrence Joseph's store was obtained in the same court appearance in which the criminal complaints and arrest warrants were signed. The plaintiffs so allege in their complaint, and they also say that the search warrant was sworn to not by any of the Oakland County defendants, but by a police officer named David Schultz. (Officer Schultz was in the employ of the City of Birmingham, and he has been dismissed from this case along with the other City of Birmingham defendants.) If any prosecutor was peripherally involved in obtaining the search warrant, I see no basis for distinguishing his conduct from the obtaining of the arrest warrants, which Part III B of the court's opinion holds is protected, without further inquiry, by absolute immunity. I note, in this connection, that plaintiffs' own counsel conceded, before the trial court, that "it is true that perhaps the mere act of seeking of the arrest warrants and the search warrant could fall within the narrow quasi-judicial function [protected by absolute immunity]...." (Emphasis supplied.) I see no need for any further factual inquiry regarding issuance of the search warrant, and to the extent the court holds such inquiry necessary, I respectfully dissent. I agree with the court, however, that if a prosecutor participated with the Birmingham police in conducting a search that went beyond the authorization contained in the warrant, the prosecutor's immunity, if any, would be qualified and not absolute.
 
 
 52
 As to Part III A, where the court considers whether the interrogation of Hal Morrow was an insulated activity, it may be useful to review the precise allegations of the plaintiffs' complaint. The complaint says:
 
 
 53
 "In the early morning hours of March 14, 1980, George Joseph, younger brother of Plaintiffs herein, was engaged in a confrontation and automobile chase with Defendant Morrow over a dispute in attempt to collect monies owed by Defendant Morrow to a mutual friend. Thereafter, Defendant Morrow lodged a Complaint with Defendant Shultz [sic] of the Defendant City of Birmingham Police Department against George Joseph and certain of his friends and associates, alleging felonious assault and extortion."
 
 
 54
 The complaint goes on to say that Plaintiff Lawrence Joseph "and others" then met with Mr. Morrow, paid him $800.00, and obtained a document releasing George Joseph from civil liability. Thereafter, the complaint alleges,
 
 
 55
 "Defendant David Schultz at the direction of others unknown to Plaintiffs and both City of Birmingham Police Department and Oakland County Prosecutor's Office caused Defendant Morrow to be arrested, transferred, interrogated, threatened, coerced and intimidated into filing criminal charges and complaints against Plaintiffs, Lawrence Joseph and Frank Joseph, for 'obstructing justice' and 'compounding a felony', both being felony offenses. Defendants Thompson, A'Hearn and Schultz specifically took part in this process. These actions were taken in bad faith, maliciously, illegally and with knowledge of the wrongfulness thereof."
 
 
 56
 The interrogation of the unfortunate Mr. Morrow (who, it is stipulated, was never served and is not a party to this action) took place after the alleged assault and extortion by George Joseph, and after the meeting at which Mr. Morrow accepted the plaintiffs' $800.00, but before the court appearance in which the obstruction of justice complaints were signed and the warrants were issued against Lawrence and Frank Joseph. All of these events, as plaintiffs' counsel told the trial court, occurred on the same day--March 14, 1980. From a temporal standpoint, at least, there can be absolutely no doubt that what occurred at Morrow's meeting with Lawrence Joseph and others earlier in the day was intimately associated with the questioning of Morrow about the meeting and with the initiation of the obstruction of justice case against Lawrence and Frank Joseph later that same day.
 
 
 57
 The older Josephs filed the instant lawsuit on August 2, 1982, and Oakland County defendants filed an answer to plaintiffs' complaint on September 23, 1982. We do not have the benefit of the extensive deposition testimony apparently elicited after the case was at issue, but it is instructive, I think, to see how plaintiffs' claims are characterized in the joint pretrial statement that the parties themselves filed with the trial court on November 15, 1983. After listing a series of claims that were being abandoned, the pretrial statement says:
 
 
 58
 "[T]he [remaining] claims of the Plaintiffs might be succinctly stated as follows: * * * [Statement of claims against City of Birmingham Defendants omitted] * * * Further, Plaintiffs claim that the Birmingham Defendants, along with the Defendants associated with the Oakland County Prosecutor's Office and the Oakland County Organized Crime Strike Force, on or about March 14, 1980, used an incident involving Plaintiff's [sic] younger brother George Joseph in order to falsely accuse the Plaintiffs herein of 'obstruction of justice' and 'compounding a felony'. Having so falsely brought said charges against the Plaintiffs here in, the Defendants, and all of them, used said false charges to obtain a search warrant for 'Market Square' which search was conducted with intent to damage said business and to find evidence of other crimes than those that led to the issuance of said warrant. Thereafter, the Defendants, and each of them, pursued and prolonged the proceedings against the Plaintiffs in bad faith and without any hope of success for the purpose of harassing Plaintiffs, causing them expense and generating publicity calculated to put Plaintiffs in a bad light and to damage their economic enterprises and social relationships."
 
 
 59
 Far from suggesting that the interrogation of Hal Morrow was not "intimately associated" with the initiation of the obstruction of justice case that was begun on the very day the interrogation took place--"intimate association" being a test arguably suggested by the Supreme Court in Imbler v. Pachtman, 424 U.S. 409, 430, 96 S.Ct. 984, 994, 47 L.Ed.2d 128 (1976)--the pretrial statement never mentions the interrogation of Mr. Morrow at all.
 
 
 60
 On December 13, 1983, all but one of the Oakland County defendants moved for an order of dismissal on the ground that they were "protected by absolute or quasi-judicial immunity...."[1] If the pretrial statement adequately preserves the claim that defendants Thompson and A'Hearn helped "coerce" Morrow into making the charges that led to the institution of the obstruction of justice case against Lawrence and Frank Joseph, the question presented to the trial court by the motion to dismiss was whether, in this context, the interrogation of Morrow was to be considered part of the process of "initiating a prosecution." That question, in my judgment, could only be answered in the affirmative.
 
 
 61
 "Clearly," as this court says in Part III C of its opinion, "decisions of when and how to prosecute are not made in a vacuum, so that in some cases the directing of police to secure further evidence may be necessary to and part of a decision to prosecute." It seems to me that the interrogation of Morrow, which dealt with facts critical to the prosecution of Lawrence and Frank Joseph and which took place on the very day the prosecution was initiated, was so clearly an integral part of the initiation of the prosecution that further factfinding would be pointless.
 
 
 62
 I see nothing in Forsyth v. Kleindienst, 599 F.2d 1203 (3rd Cir.1979), that suggests otherwise. The defendants in Forsyth were former Attorneys General of the United States who had been sued for authorizing, on national security grounds, warrantless wiretaps. Unlike the interrogation of Mr. Morrow, the wiretaps never resulted in the initiation of a prosecution, as far as the opinion discloses, much less the initiation of a prosecution on the very day of the investigatory conduct complained of. In fact, as we know from the subsequent opinion in Mitchell v. Forsyth, --- U.S. ----, 105 S.Ct. 2806, 2810, 86 L.Ed.2d 411 (1985), the trial court determined on remand that Attorney General Mitchell's wiretap authorization "was not intended to facilitate any prosecutorial decision or further a criminal investigation", and "Mitchell himself had disavowed any such intention and insisted that the only reason for the wiretap was to gather intelligence needed for national security purposes." (Emphasis supplied.) The main significance of Forsyth for our purposes, I think, is not that the Court of Appeals found it necessary to remand for further factfinding, but that the court explicitly confirmed that absolute immunity can attach to investigative activity occurring before there is a final decision to prosecute. As the court said:
 
 
 63
 "To grant a prosecuting attorney immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decisionmaking and the potential for needless actions. We believe that the right to make the decision without being subject to suit must include some limited right to gather necessary information." 599 F.2d at 1215. (Emphasis supplied.)
 
 
 64
 Expanding on dicta found in footnote 33 in the final paragraph of the Supreme Court opinion in Imbler v. Pachtman, 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33, the Forsyth court did go on to say "we are sensitive to the possibility that this narrow exception could be distorted to include all of a prosecutor's investigative activities." 599 F.2d at 1215. Accordingly, said the court, "[w]e hold only that to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself." Id. Applying that holding here, it follows that if the prosecutor's interrogation of Mr. Morrow was "necessary to [the] prosecutor's decision to initiate a criminal prosecution" against Lawrence and Frank Joseph, as I see no reason to doubt that it was, absolute immunity attaches.
 
 
 65
 Footnote 33 in Imbler suggests that "difficult questions" may be presented in determining the point at which a prosecutor's obtaining of evidence in preparation for the initiation of criminal proceedings crosses the line beyond which the prosecutor functions as an "administrator," thereby losing the protection of absolute (as opposed to qualified) immunity. That is obviously true, but I think we are nowhere near that point in the case at bar.
 
 
 66
 Some lower courts, as I read the cases, may have strayed away from binding Supreme Court precedent in concluding that a prosecutor engaged in functions "essentially investigative" has no absolute immunity. See, e.g., cases cited in McSurely v. McClellan, 697 F.2d 309, 318, 320 (D.C.Cir.1982). Although the Supreme Court did say, in Imbler, that it had no occasion there to consider whether reasons similar to those requiring absolute immunity for prosecutorial activities "intimately associated with the judicial phase of the criminal process" require immunity "for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate," 424 U.S. at 430-31, 96 S.Ct. at 994-95, just such a question was answered affirmatively in Yaselli v. Goff, 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927), a case that Imbler cites with evident approval. 424 U.S. at 422, 96 S.Ct. at 991.
 
 
 67
 In Yaselli v. Goff, as we learn from the opinion of the Court of Appeals reported at 12 F.2d 396 (2d Cir.1926), Mr. Yaselli had filed pleadings alleging that defendant Goff, acting out of wrongful motives and pursuant to a conspiracy to prosecute Yaselli maliciously and without cause, had prevailed upon Attorney General A. Mitchell Palmer to appoint him a special assistant to the Attorney General "to assist in the investigation and prosecution" of Mr. Yaselli for defrauding the United States in connection with the purchase of a steamship from the U.S. Shipping Board. 12 F.2d at 399. (Emphasis supplied.) Yaselli's pleadings further alleged that defendant Goff conspired to obtain the appointment of a receiver for a shipping company of which Yaselli was president "and thereby obtain inspection of papers and documents upon which to base such prosecution." 12 F.2d at 398. The pleading alleged that defendant Goff caused the receiver wrongfully to seize personal records, knowing that they belonged to Yaselli and not the shipping company, and let defendant Goff inspect them in furtherance of the malicious prosecution. It was stipulated that after Goff accepted appointment as a special assistant he appeared before a grand jury, presented evidence, and procured an indictment on which Yaselli was tried. Yaselli's acquittal at that trial was followed by a malicious prosecution action against Goff.
 
 
 68
 In seeking a dismissal of the complaint, Defendant Goff moved to strike the pleading in which he had been accused of conducting an improper investigation. 12 F.2d at 399. The trial court granted the motion to strike and dismissed the complaint. Id. Yaselli appealed, and a panel consisting of Circuit Judges Rogers, Hough and Manton concluded that the pleading had been properly stricken and the trial court's judgment should be affirmed.[2]
 
 
 69
 The Supreme Court, in a per curiam decision, affirmed the judgment of the Court of Appeals on the authority of Bradley v. Fisher, 13 Wall. 335, 347, 20 L.Ed. 646 (1872), and Alzua v. Johnson, 231 U.S. 106, 111, 34 S.Ct. 27, 29, 58 L.Ed. 142 (1913).
 
 
 70
 The former opinion, delivered for the Supreme Court by Mr. Justice Field in the year following enactment of the statute now codified at 42 U.S.C. Sec. 1983, contains a detailed discussion of the history of the doctrine of absolute immunity and the policy reasons for concluding that judges ought not be required to defend themselves against suits charging that acts performed in their official capacity were done maliciously or corruptly. In the latter case the Supreme Court, speaking through Mr. Justice Holmes, said it was "fundamental" that the absolute immunity for judges would extend to a Justice of the Supreme Court of the Philippine Islands after those Islands were acquired by the United States. In applying the Bradley and Alzua cases to the situation in Yaselli, the Supreme Court necessarily held that Prosecutor Goff was entitled to the same kind of absolute immunity that applies to the official acts of judges--and that such immunity covered the conduct complained of in the stricken pleadings, including the securing of the appointment to prosecute Mr. Yaselli and the obtaining of Mr. Yaselli's personal papers and documents through improper means.
 
 
 71
 In Gregoire v. Biddle, 177 F.2d 579 (2d Cir.1949), Chief Judge Learned Hand--whose tenure on the Court of Appeals outlasted that of Judge Manton, his sometime colleague--dealt with a situation where the trial court, like the trial court here, had dismissed the plaintiff's complaint under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. The defendants in that case included two Attorneys General of the United States who were accused of having maliciously kept the plaintiff in custody for some years on the pretense that he was an enemy alien, when in fact he was not. The trial judge "held that the defendants had an absolute immunity from liability, even though their unlawful acts had been induced only by personal ill-will...." 177 F.2d at 579. Acknowledging that it seemed "at first blush a startling proposition" that the complaint should not be permitted to stand even if read as specifically alleging that the defendants "had acted altogether from personal spite and had been fully aware that they had no legal warrant for arresting or deporting the plaintiff," Judge Hand, writing for himself and Judges Swan and Clark, said not only that this conclusion "necessarily follows from the decision of the Supreme Court in Yaselli v. Goff," 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395, "but that as a new question, the result is desirable." 177 F.2d at 580.
 
 
 72
 In a passage evincing the strength of mind and felicity of expression that contributed to Judge Hand's reputation as one of our better jurists, the opinion went on to say:
 
 
 73
 "It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent a well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation. Judged as res nova, we should not hesitate to follow the path laid down in the books." 177 F.2d at 581.
 
 
 74
 Judged as res nova, I might not consider it unfair to hold that the immunity of a prosecutor in respect of his official acts should be conditional only, and not absolute. Judged as res nova, I might see no unfairness in remanding the case at bar for a factual determination of how "intimately associated" the interrogation of Mr. Morrow was with the decision to prosecute Lawrence and Frank Joseph. Because I do not believe that this is the path laid down by the Supreme Court, however, and because I think it is a foregone conclusion what the result of such a factual inquiry will be, I must respectfully dissent from Part III A of the court's opinion in the case at bar.
 
 
 75
 With respect to Part IV of the court's opinion, which deals with the two non-lawyer employees of a division of the Oakland County Prosecutor's Office called the "Criminal Investigation Division and Organized Crime Strike Force," I note that Mr. Leon, the assistant investigator, is not alleged to have participated in the interrogation of Mr. Morrow. Because it is claimed that he participated in the allegedly improper search of the Lawrence Joseph's store, however, and because Mr. Leon did not join in the motion to dismiss filed by the other Oakland County defendants, I agree that the district court acted prematurely in dismissing the case as to Mr. Leon.
 
 
 76
 Mr. A'Hearn, the Chief of the Criminal Investigation Division and Organized Crime Strike Force, is claimed to have taken part, with Police Officer David Schultz and Chief Assistant Prosecutor Richard Thompson, in the interrogation and alleged coercion of Mr. Morrow. I agree with the court that Mr. A'Hearn would be entitled only to qualified immunity, in respect of these activities, unless he was acting pursuant to the express direction and control of a prosecutor. The presence of Chief Assistant Prosecutor Thompson suggests to me that Mr. A'Hearn almost certainly was acting pursuant to such express direction and control, but I have no difficulty with letting this assumption be confirmed on remand as long as there must be further proceedings as to Mr. A'Hearn in any event--and I agree with the court that such proceedings are required in order to clarify the role played by Mr. A'Hearn in the conduct of the search of Mr. Lawrence Joseph's store. I also agree that the judgment of dismissal must be reversed as to the three prosecutors because they had only qualified immunity in dealing with or sitting on the Concealed Weapons Licensing Board and in opposing expunction of the plaintiffs' police records.
 
 
 77
 To the extent that the court's judgment authorizes further proceedings beyond the scope I have suggested is proper, I respectfully dissent. In all other respects, I concur in the judgment.
 
 
 
 [1]
 The complaint originally also named as defendants the City of Birmingham, its police chief, a police officer, and other municipal departments; however, these defendants entered into a settlement agreement with the appellants the day before trial
 
 
 [2]
 Although not part of the record on appeal, we take notice of the fact that the Oakland County Circuit Court reversed the Concealed Weapons Licensing Board's decision on the basis that the Board denied Joseph's due process rights by applying new and different standards to his application without affording notice and an opportunity to comply with the new standards. Joseph v. Oakland County Concealed Weapons Licensing Board, No. 82-247153 AA (Oakland County Circuit Court, March 7, 1984)
 
 
 [3]
 The Supreme Court recently recognized again that Imbler left open this issue, and declined to express any view on it. Pembaur v. City of Cincinnati, --- U.S. ----, ---- n. 2, 106 S.Ct. 1292, 1295 n. 2, 89 L.Ed.2d 452 (1986)
 
 
 [4]
 The Supreme Court has also since indicated that a person immunized by his quasi-judicial functions is not excused from responding as a witness in legal actions against non-immunized co-conspirators. Dennis v. Sparks, 449 U.S. 24, 30-31, 101 S.Ct. 183, 187-88, 66 L.Ed.2d 185 (1980)
 
 
 [5]
 In Cleavinger, as in the instant case, judicial review of the board decision was available; however, this did not outweigh the other factors which favored qualified immunity. --- U.S. at ----, 106 S.Ct. at 501. We also note that due to the recognition by Michigan courts of the wide discretion vested by the legislature in law enforcement official "professionals" to determine fitness for weapons permits, a great deal of deference appears to be accorded the boards' findings. Bay County, 96 Mich.App. at 791, 293 N.W.2d 707
 
 
 [1]
 The motion purports to have been brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, but an answer to the complaint had been filed more than a year earlier. Technically, a Rule 12(b)(6) motion is untimely after the case is at issue and no further pleading is permitted. Wright & Miller, Federal Practice and Procedure: Civil Sec. 1357. The plaintiffs have made no issue of this, and it seems appropriate to treat the defendants' motion as a motion for judgment on the pleadings
 
 
 [2]
 While Judge Manton did not write the opinion of the Court of Appeals, his presence on the panel reminds us that judges are no more immune from the temptation to abuse their powers than prosecutors are. The subsequent fate of Judge Manton, however, reminds us that judicial immunity from civil liability "does not leave the public powerless to deter [judicial] misconduct or to punish that which occurs." Imbler, 424 U.S. at 429, 96 S.Ct. at 994. Noting that "[e]ven judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights," the Imbler court noted that "[t]he prosecutor would fare no better for his willful acts." Id