**Billie M. IRELAND, Plaintiff,**

v.

**Gary L. TUNIS, Richard Thompson, John Meiers and Richard D. Kuhn, Defendants.**

No. 94–CV–74931–DT.

United States District Court, E.D. Michigan, Southern Division.

Nov. 5, 1995.

Frank D. Eaman, Harper Woods, Michigan, for plaintiff.

Thomas P. Vincent, Detroit, Michigan, John M. Skrzynski, Pontiac, Michigan, for defendants.

## OPINION AND ORDER REGARDING PLAINTIFF'S AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiff Billie M. Ireland ("Plaintiff"), Mayor of the City of Rochester Hills since 1985, brought this action against Defendants Gary L. Tunis, Richard Thompson, John Meiers, and Richard D. Kuhn on December 8, 1994. Defendants Tunis, Thompson and Meiers ("Defendants") are, respectively, an Assistant Prosecuting Attorney for Oakland

County, the Oakland County Prosecutor (an elected official), and an investigator for the Prosecutor's Office. Defendant Richard D. Kuhn (also elected) is a Circuit Court Judge for Oakland County. Plaintiff brought her claims under 42 U.S.C. § 1983, alleging violations of her Fourth and Fourteenth Amendment rights by all Defendants. Specifically, Plaintiff asserts that she was arrested pursuant to an illegally obtained warrant.

In an opinion and order issued on July 13, 1995, this Court granted Defendant Kuhn's motion for summary judgment as to all claims against him. The remaining Defendants have now filed a motion for summary judgment on the remaining claims. Plaintiff has also filed a motion for summary judgment on those claims. In addition, Plaintiff has filed a motion to compel discovery, seeking to depose Assistant Prosecuting Attorney Lawrence Kozma, the chief of the warrant division of the Prosecutor's Office at the time the arrest warrant was issued, and also requesting additional documents allegedly bearing on the decision to seek a warrant for Plaintiff's arrest.

Counsel for the parties addressed these motions at a hearing before this Court on October 19, 1995. After considering the arguments made by counsel at that hearing and reviewing all of the documents filed by the parties, the Court is now prepared to rule on these motions. For the reasons stated below, the Court hereby grants Defendants' motion for summary judgment. This determination necessarily dictates the denial of Plaintiff's motions for summary judgment and to compel discovery.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On October 5, 1993, Defendant Kuhn, who was at that time the Chief Judge of the Oakland County Circuit Court, issued a warrant for the arrest of Plaintiff, based on allegations made in a criminal complaint signed by Defendants Tunis and Meiers, authorized by Defendants Thompson and Tunis, and apparently presented to Judge Kuhn by Defendants Tunis and Meiers. This supporting complaint accused Plaintiff, in essence, of participating in a scheme to misappropriate public funds. The following day, Plaintiff surrendered to authorities. On May 20, 1994, after conducting a preliminary hearing, a Michigan district court judge dismissed all charges against Plaintiff for lack of probable cause. Plaintiff subsequently commenced the instant action pursuant to 42 U.S.C. § 1983, alleging that Defendants' actions in securing an arrest warrant violated her constitutional rights under the Fourth and Fourteenth Amendments.

### A. The Alleged Basis for Criminal Charges Against Plaintiff

The allegations that led to Plaintiff's arrest concern payments made by the City of Rochester Hills (the "City") to Gerald Carlin ("Carlin") of the Oakland County Sheriff's Department. Rather than creating its own police force, the City elected many years ago to enter into a contract with Oakland County, under which the County Sheriff's Department provides police services to the City. Carlin was assigned to the Rochester Hills Substation of the Sheriff's Department, and has been responsible for overseeing all law enforcement activities within the City since the mid–1980s.

When the City sought to increase its police force and appoint a captain for its Substation, Plaintiff, the City's Mayor, entered into discussions with various Sheriff's Department representatives, including Oakland County Sheriff John Nichols. These discussions culminated in the formation of a new contract for law enforcement services, which was signed in January, 1991, by Plaintiff, Sheriff Nichols, and the Oakland County Executive.

This contract, like prior agreements, called for the City to pay the County for the provision of police services, and for the County in turn to compensate the individual officers who provided such services. Although the contract provided that the City "shall not be *required* to assume any liability for the direct payment of salaries, wages or other compensation to the County for any County personnel performing the services set forth in this document," (Plaintiff's Brief in Opp'n to Defendants' Motion for Summary Judgment, Ex. 3, ¶ 3) (emphasis added), the contract

apparently did not forbid direct payments by the City to individual officers.

In conjunction with the execution of this new contract, Carlin was appointed Captain of the Rochester Hills Substation in January, 1991. Sheriff's Department rules provided that, as a captain, Carlin was no longer eligible for overtime pay. However, the contract between the City and Oakland County provided that "Law Enforcement Services beyond the scope of this contract are available upon request by the local jurisdiction to be paid for at the established overtime rate." (Plaintiff's Brief in Opp'n to Defendants' Motion for Summary Judgment, Ex. 3, ¶ 4). Moreover, Plaintiff alleges that her administrative assistant, Doris Keylon, obtained the approval of a Sheriff's Department official for the City to make overtime payments directly to Carlin.

Accordingly, in January, 1991, the City began to directly compensate Carlin for his overtime hours. These payments, authorized by Plaintiff, totalled over $20,000.00 for the period between January, 1991, and December, 1992. The City originally planned to pay Carlin a fixed weekly amount, but eventually arrived at an arrangement under which Carlin submitted overtime time sheets for Plaintiff's approval each pay period, and the City then compensated Carlin at one and one-half times his usual hourly rate for his overtime hours.

### B. *The Preparation and Filing of the Criminal Complaint*

In December, 1992, after receiving an anonymous letter alleging various improprieties in the Rochester Hills Substation, the Sheriff's Department began an internal investigation of Carlin. This investigation revealed that Carlin was receiving regular payments from the City. The parties dispute whether the County Prosecutor's Office became involved in the investigation in late 1992, or only upon Plaintiff requesting such involvement in early 1993.

Following a lengthy investigation, the Prosecutor's Office decided in October, 1993, to seek a warrant for Plaintiff's arrest. The criminal complaint prepared by Defendant Tunis during the course of this investigation charged Plaintiff, Carlin, and Doris Keylon with wrongdoing under two general theories.[1] First, the complaint alleged that the City's direct payments to Carlin violated a state statute that requires counties to pay the salaries of sheriffs and deputy sheriffs. *See* Mich.Comp.Laws Ann. §§ 45.401–08. Next, the complaint alleged that the City budget prepared by Plaintiff improperly concealed the payments to Carlin, and that those payments therefore were not authorized by the Rochester Hills City Council.

Although the parties still dispute some details regarding the preparation of the criminal complaint and its presentation to Judge Kuhn, the record adequately discloses the pertinent aspects of each Defendant's role in that process. Defendant Thompson received occasional informal reports regarding the status of the investigation, attended a meeting in the late summer of 1993 at which various possible charges against Plaintiff were discussed, ordered that some of the proposed charges against Plaintiff be deleted from the complaint, and ultimately authorized and concurred in the decision of the assistant prosecutors to seek an arrest warrant. Defendant Tunis, as one of the two assistant prosecutors assigned to oversee the

---

1. The complaint included eight counts; counts one through six applied to Plaintiff, Carlin, and Doris Keylon, while counts seven and eight named only Carlin. Count one alleged a conspiracy by public officials to embezzle over $50. Count two alleged a conspiracy to commit the common-law offense of "misconduct in public office" through payment of city funds to Carlin. Count three alleged a conspiracy to use public funds for a purpose contrary to law. Counts four through six charged each individual with the offenses underlying the conspiracy charges in counts one through three. Finally, count seven charged Carlin with receipt of stolen property in excess of $100, and count eight charged Carlin with receiving additional compensation for duties for which he was already being paid by the Sheriff's Department.

Counts two and five included fairly lengthy (and nearly identical) statements of facts, and count eight alleged that Carlin received additional compensation from the City of Rochester Hills. The remaining counts included essentially no supporting facts; rather, they stated the relevant provisions of the laws that allegedly were violated.

investigation,[2] periodically met with investigators (including Defendant Meiers), reviewed interview transcripts and documents provided by the investigators, and drafted and frequently updated the criminal complaint as the investigation progressed. Defendant Meiers was one of the investigators who interviewed witnesses and obtained and reviewed documents, and he also signed the complaint as prepared and presented to him by Defendant Tunis without suggesting any changes.

After signing the criminal complaint,[3] Defendants Tunis and Meiers presented it to Defendant Kuhn on October 5, 1993.[4] Plaintiff alleges that Judge Kuhn held no hearing before issuing the arrest warrant, and that the complaint was not sworn to under oath as required by the Fourth Amendment. However, at his deposition, Judge Kuhn testified that the complaint was sworn to under oath, and that he did hold a hearing on the matter, albeit without a court reporter present.[5] (Kuhn Dep. at 18–21). In any event, Judge Kuhn issued the warrant for Plaintiff's arrest on October 5, 1993.

After hearing four days of testimony, Michigan District Court Judge Nelson ordered on May 20, 1994, that all charges against Plaintiff and Doris Keylon be dismissed for lack of probable cause. Judge Nelson also dismissed all but one of the charges against Carlin. Carlin was tried on the remaining misdemeanor charge of accepting payments from the City in violation of Mich.Comp.Laws § 45.408, and was acquitted by a jury on May 25, 1995. Finally, in response to a motion to quash the warrant for Plaintiff's arrest, Judge Nelson issued an opinion finding that the procedure used to obtain the warrant violated the Fourth Amendment.

## C. *Procedural Background*

Plaintiff filed the instant suit on December 8, 1994, alleging that Defendants' actions constituted an unreasonable seizure in violation of the Fourth Amendment. In particular, Plaintiff contends that the criminal complaint signed by Defendants Tunis and Meiers and authorized by Defendant Thompson failed to state a violation of any Michigan criminal law by Plaintiff. Moreover, Plaintiff asserts that the warrant for her arrest was not obtained in a proper judicial proceeding, because the complaint was not sworn to under oath and failed to establish probable cause that a criminal offense had been committed, and because Defendant Kuhn was not authorized under Michigan law to issue arrest warrants. Finally, Plaintiff alleges that her arrest was attributable to the "impure and malicious" motives of Defendants Tunis, Meiers, and Thompson.

By opinion and order dated July 13, 1995, this Court granted Defendant Kuhn's motion for summary judgment, holding that Defendant Kuhn was entitled to absolute immunity for the acts he performed in his judicial capacity. The Court found that, regardless

---

**2.** Kim Wilson, the other assistant prosecutor involved in the investigation, was not named as a defendant in the instant suit.

**3.** The complaint designates Defendant Meiers as the "complaining witness" and Defendant Tunis as the Assistant Prosecuting Attorney who "authorized" the application for a warrant.

**4.** At his deposition, Defendant Kuhn recalled that Defendant Tunis presented the complaint and sought the arrest warrant, but Judge Kuhn was not certain whether Tunis was accompanied by others from the Prosecutor's Office. (Kuhn Dep. at 17–18). Defendant Tunis testified at his deposition that an unsigned copy of the complaint was delivered to Judge Kuhn the evening before the warrant was issued, and that he, Defendant Meiers, and perhaps Kim Wilson were present when Judge Kuhn issued the warrant on October 5. (Tunis Dep. at 47–48, 55–56, 59) Defendant Meiers similarly testified at his deposition that he

was given a copy of the complaint on October 4, and that he signed and swore to the contents of the complaint before Judge Kuhn on October 5. (Meiers Dep. at 127, 138).

**5.** The deposition testimony of Defendant Tunis supports Judge Kuhn's account. Tunis testified that on October 5, 1993, he presented the warrant paperwork to Judge Kuhn, Defendant Meiers was sworn in, Defendant Meiers signed the complaint, and Judge Kuhn then signed the warrant. (Tunis Dep. at 59). According to Tunis, Judge Kuhn stated that he could make his probable cause determination based on the allegations contained in the complaint without need for sworn testimony, and that a Michigan statute authorized him to issue the arrest warrant without taking any sworn testimony. (Tunis Dep. at 56–57).

of whether Michigan law authorizes state Circuit Court judges to issue arrest warrants, Defendant Kuhn did not act in the clear absence of all jurisdiction when he issued the warrant for Plaintiff's arrest.

The Court is now presented with cross-motions for summary judgment. On August 31, 1995, the remaining Defendants filed a motion for summary judgment, based on the contention that they, like Judge Kuhn, are immune from suit under 42 U.S.C. § 1983 for the acts attributed to them. Also on August 31, 1995, Plaintiff filed a motion for summary judgment, based on the assertion that all of the elements underlying her claim have been conclusively established in state court or are otherwise no longer in dispute.

## III. ARGUMENTS OF THE PARTIES

In support of their motion for summary judgment, Defendants argue that they are entitled to absolute immunity from suit for the acts alleged by Plaintiff, because all of the alleged acts were undertaken as part of initiating and pursuing a criminal prosecution. Alternatively, Defendants contend that they should prevail as a matter of law even if they are entitled only to qualified immunity for their acts, because those acts did not violate any "clearly established rights" of the Plaintiff. Finally, apart from any question of immunity, Defendants assert that the undisputed facts show that Plaintiff does not have a viable claim under 42 U.S.C. § 1983.

In response to Defendants' motion, Plaintiff contends that absolute prosecutorial immunity does not attach where a warrant is procured without probable cause and in a court lacking jurisdiction to issue arrest warrants. Plaintiff also points out that Defendants' answer to her complaint asserted the defense of absolute immunity only as to Defendant Thompson, and not as to Defendants Tunis and Meiers. Next, Plaintiff asserts that qualified immunity does not shield Defendants from suit because their acts were objectively unreasonable.

Plaintiff's final response to Defendants' motion for summary judgment also constitutes the basis for her own motion for summary judgment. Specifically, Plaintiff contends that the Michigan district court's findings that the state lacked probable cause to proceed against her and that the arrest warrant was issued in violation of the Fourth Amendment conclusively establish her *prima facie* case under 42 U.S.C. § 1983. Because the district court already addressed the issues surrounding the issuance of the warrant, Plaintiff asserts that Defendants are estopped from relitigating those issues. Accordingly, Plaintiff reasons that these conclusively established elements of her complaint, when combined with the undisputed facts, entitle Plaintiff to summary judgment on her substantive claims, leaving only the issue of damages for trial.

In response, Defendants cite several reasons why collateral estoppel should not apply to the issues addressed by the Michigan district court. In particular, Defendants point to the substantially different procedural posture of the Michigan court proceedings, and contend that Defendants lacked the opportunity or incentive to fully litigate the matters surrounding procurement of the arrest warrant in the Michigan court. Moreover, even if those matters were conclusively established by the Michigan court, Defendants contend that Plaintiff has failed to establish the intent necessary to prevail in a § 1983 claim.

## IV. ANALYSIS

### A. The Standards Governing Consideration of a Motion for Summary Judgment

The applicable Federal Rule of Civil Procedure dictates that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[6] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ After reviewing the above trilogy of cases, the Sixth Circuit announced a set of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* \* \* \* \* \*

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that

there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*See Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply these principles in its evaluation of the parties' motions for summary judgment.

### B. *Defendants Thompson and Tunis are Absolutely Immune from Plaintiff's § 1983 Claims*

In their motion for summary judgment, Defendants assert that they are entitled to absolute immunity from Plaintiff's § 1983 claims, because all of the acts alleged by Plaintiff were performed as part of Defendants' initiation and pursuit of a criminal prosecution. If Defendants can establish that they are entitled to absolute immunity, then this Court need proceed no further, because absolute immunity would entirely bar Plaintiff's suit.

■ Plaintiff first notes that Defendants' answer to her complaint asserted absolute immunity only as to the claims against Defendant Thompson, and argues that the remaining Defendants have waived this defense. As shown by the very case Plaintiff cites in support of this supposed waiver, this contention is without merit. In *English v. Dyke,* 23 F.3d 1086, 1089–91 (6th Cir.1994), the Sixth Circuit reversed a district court's ruling that the defendants had waived the defense of qualified immunity by failing to raise it in their pre-answer motion to dismiss. The court found that such a failure to assert the defense of qualified immunity "would generally only waive the defense for the stage at which the defense should have been asserted." 23 F.3d at 1090. To illustrate this rule, the court noted that "a defendant who fails to timely assert the defense prior to

---

**6.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure,* § 2727, at 35 (Supp.1994).

discovery may waive the right to avoid discovery *but may nonetheless raise the issue after discovery on summary judgment or at trial."* 23 F.3d at 1090 (emphasis added).

The holding in *English* applies as well to the defense of absolute immunity, as shown by the case upon which *English* relies, *Kennedy v. City of Cleveland,* 797 F.2d 297 (6th Cir.1986). In *Kennedy,* the court found that the same principles of waiver and appealability govern both qualified and absolute immunity. 797 F.2d at 300–01. Although the court stated that "the failure to plead immunity may, at different stages of the litigation, work either a partial or complete waiver," the court's subsequent discussion reveals that a defense of immunity generally should be deemed completely waived only when the trial court finds waiver necessary "to maintain control of [its] docket and to assure the expeditious advancement of cases." 797 F.2d at 300. Accordingly, because there is no indication here that Defendants Tunis and Meiers sought to prejudice Plaintiff or delay this litigation by first asserting the defense of absolute immunity in their motion for summary judgment, and because Plaintiff was put on notice of this defense through Defendant Thompson's assertion of it in Defendants' combined answer to the complaint, the Court finds that all three Defendants may properly seek to invoke the defense of absolute immunity.

Accordingly, this Court now turns to its substantive inquiry into the defense of absolute immunity. This inquiry begins with *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976), in which the Supreme Court explicitly held that state prosecutors are entitled to absolute immunity from civil suits under § 1983 for actions taken "in initiating a prosecution and in presenting the State's case." In *Imbler,* a convicted criminal defendant who was eventually set free pursuant to a writ of habeas corpus filed a § 1983 suit against a Los Angeles deputy district attorney, claiming that the prosecutor had knowingly used false testimony and suppressed material evidence at his trial. 424 U.S. at 412–16, 96 S.Ct. at 986–88. The Court surveyed the development of prosecutorial immunity at common law, and reasoned

that the considerations that led to common-law immunity "dictate the same absolute immunity under § 1983 that the prosecutor enjoys at common law." 424 U.S. at 421–27, 96 S.Ct. at 990–93.

In particular, the Court cited two compelling reasons for conferring absolute immunity upon prosecutors. First, after noting that prosecutors enjoy common-law immunity from malicious prosecution suits, the Court reasoned:

> If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties no less than would the threat of common-law suits for malicious prosecution. A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.

424 U.S. at 424, 96 S.Ct. at 992. Among other concerns, the Court specifically sought to avoid any undue influence that public curiosity might exert upon a prosecutor's decisionmaking:

> A prosecutor often must decide, especially in cases of wide public interest, whether to proceed to trial where there is a sharp conflict in the evidence. The appropriate course of action in such a case may well be to permit a jury to resolve the conflict. Yet, a prosecutor understandably would be reluctant to go forward with a close case where an acquittal likely would trigger a suit against him for damages.

424 U.S. at 426 n. 24, 96 S.Ct. at 993 n. 24.

Next, the Court found that absolute prosecutorial immunity was necessary to ensure the effectiveness of judicial proceedings:

> The affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system. Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecutor and the defense have wide discretion in the conduct of the trial and the presentation of evidence.

424 U.S. at 426, 96 S.Ct. at 993 (footnote omitted). Accordingly, although the Court recognized that "this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty," the Court concluded that the district attorney's activities in the instant case "were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." 424 U.S. at 427–31, 96 S.Ct. at 993–95.

Having established the availability of prosecutorial immunity as a defense to § 1983 suits, the Supreme Court considered the precise boundaries of this immunity in three subsequent cases. First, although the case of *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), involved a § 1983 suit against a police officer rather than a prosecutor, the Court found it necessary to discuss prosecutorial immunity in order to explain why that defense was *not* available to the police officer. The plaintiffs claimed that the officer had violated their Fourth Amendment rights by applying for arrest warrants based on complaints and affidavits that allegedly failed to establish probable cause. 475 U.S. at 337–39, 106 S.Ct. at 1094–95.

The *Malley* Court rejected the officer's argument that his decision to seek a warrant was analogous to a prosecutor's decision to seek an indictment, and thus was protected by absolute immunity under the reasoning of *Imbler*:

> We have interpreted § 1983 to give absolute immunity to functions "intimately associated with the *judicial* phase of the criminal process" not from an exaggerated esteem for those who perform those functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself. We intend no disrespect to the officer applying for a warrant by observing that his action, while a vital part of the administration of criminal justice, is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment.

> Furthermore, [the officer's] analogy, while it has some force, does not take account of the fact that the prosecutor's act in seeking an indictment is but the first step in the process of seeking a conviction. Exposing the prosecutor to liability for the initial phase of his prosecutorial work could interfere with his exercise of independent judgment at every phase of his work, since the prosecutor might come to see later decisions in terms of their effect on his potential liability. Thus, we shield the prosecutor seeking an indictment because any lesser immunity could impair the performance of a central actor in the judicial process.

475 U.S. at 342–43, 106 S.Ct. at 1097. The Court thus concluded that the officer was entitled only to qualified immunity for his procurement of an arrest warrant. 475 U.S. at 344, 106 S.Ct. at 1098.

Next, in *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), the Court considered whether the defense of absolute immunity was available for two specific activities performed by a prosecutor. In that case, Plaintiff Cathy Burns, who was charged with attempted murder but against whom all charges were eventually dropped, brought a § 1983 suit claiming that a prosecutor had knowingly relied upon a police officer's false testimony at a search warrant hearing, and that the prosecutor had provided false legal advice to the police by telling them that they "probably had probable cause" to arrest Burns. 500 U.S. at 483, 488, 111 S.Ct. at 1937, 1940. The Court first cited *Imbler*'s recognition that prosecutors assume two distinct roles, serving both as advocates for the state and as administrators of criminal investigations. 500 U.S. at 489–92, 111 S.Ct. at 1941–42. Because the prosecutor acted in his advocacy role in appearing at the search warrant hearing, and because "the issuance of a search warrant is unquestionably a judicial act," the Court held the prosecutor absolutely immune from a § 1983 claim based on his actions at the search warrant hearing. 500 U.S. at 492, 111 S.Ct. at 1942.

Regarding the prosecutor's act of providing legal advice to the police, however, the Court found that this act lies within a prose-

cutor's investigative role. 500 U.S. at 492–94, 111 S.Ct. at 1943. The Court, after noting the absence of an analogous common-law immunity, declined to extend absolute immunity to this investigatory function. 500 U.S. at 492–96, 111 S.Ct. at 1943–45. Rather, the Court found that providing legal advice as part of a criminal investigation is not sufficiently closely related to the judicial process to warrant its protection through absolute immunity. 500 U.S. at 494, 111 S.Ct. at 1943. In addition, the Court noted the scarcity of remedial devices available to deter a prosecutor's abuses while performing investigative tasks:

> [W]e note that one of the most important checks, the judicial process, will not necessarily restrain out-of-court activities by a prosecutor that occur prior to the initiation of a prosecution, such as providing legal advice to the police. This is particularly true if a suspect is not eventually prosecuted. In those circumstances, the prosecutor's action is not subjected to the "crucible of the judicial process."

500 U.S. at 496, 111 S.Ct. at 1944 (citations omitted).

In a separate opinion, Justice Scalia reached an issue that is particularly relevant to the instant matter: namely, whether the prosecutor was entitled to absolute immunity for his decision to initiate the search warrant proceeding. Upon finding that the common law did not confer such immunity, Justice Scalia asserted that absolute immunity should similarly be unavailable in a § 1983 suit, notwithstanding language in *Imbler* that might suggest otherwise. 500 U.S. at 498–506, 111 S.Ct. at 1946–49 (Scalia, J., concurring in part and dissenting in part). Justice Scalia reasoned that the prosecutor's role in seeking a search warrant was more analogous to the police officer's act of procuring an arrest warrant in *Malley* than to the prosecutor's acts under consideration in *Imbler*. 500 U.S. at 505, 111 S.Ct. at 1949. Accordingly, Justice Scalia contended that *Malley* rather than *Imbler* should determine the extent of immunity for the act of seeking a search warrant, and he concluded that a prosecutor should enjoy only qualified immu-

nity for that act. 500 U.S. at 505, 111 S.Ct. at 1949.

The Supreme Court most recently considered the scope of prosecutorial immunity in *Buckley v. Fitzsimmons*, —— U.S. ——, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). That case concerned a § 1983 claim that state prosecutors fabricated evidence in order to obtain an indictment and made false statements to the press that impaired the fairness of the § 1983 plaintiff's criminal trial. —— U.S. at ——, 113 S.Ct. at 2610. The Court found that the prosecutors were not entitled to absolute immunity for the alleged fabrication of evidence since this alleged act, which was undertaken well before a grand jury was impaneled, fell within the prosecutors' investigatory role. —— U.S. at ——, 113 S.Ct. at 2616–17. Neither could the prosecutors claim absolute immunity for their statements to the press, because "[c]omments to the media have no functional tie to the judicial process just because they are made by a prosecutor." —— U.S. at ——, 113 S.Ct. at 2618.

Two guiding principles emerge from these Supreme Court cases. First, in order to ensure that absolute immunity serves its principal purpose of safeguarding the judicial process, the Court has limited absolute immunity to acts falling within the prosecutor's role as advocate for the state, as opposed to the prosecutor's investigative role. Next, the Supreme Court has adopted a "functional" approach, finding that absolute immunity is conferred for the performance of prosecutorial functions, and not "merely because [those functions] are performed by a prosecutor." *Buckley*, —— U.S. at ——, 113 S.Ct. at 2615. Thus, the function performed by the § 1983 defendant, rather than that defendant's designation as a prosecutor, determines whether absolute immunity applies. *Cf. Salyer v. Patrick*, 874 F.2d 374 (6th Cir. 1989) (finding that state social workers were entitled to absolute immunity for filing a child abuse petition in juvenile court).

This Court's inquiry into the scope of prosecutorial immunity is informed not only by these general principles derived from Supreme Court cases, but also by a Sixth Circuit case squarely holding that a prosecutor's

decision to file a criminal complaint and seek an arrest warrant was protected by absolute immunity. *Joseph v. Patterson,* 795 F.2d 549, 555–56 (6th Cir.1986). The § 1983 plaintiff in *Joseph* asserted that arrest warrants were "knowingly obtained ... based on false, coerced statements elicited ... by the prosecutors and police." 795 F.2d at 555. The court stated:

> [W]e find that such conduct, however reprehensible, would be protected by absolute immunity. The decision to file a criminal complaint and seek issuance of an arrest warrant are quasi-judicial duties involved in "initiating a prosecution," which is protected by *Imbler.* To be sure, there are some cases which hold that such conduct is not subject to absolute immunity either because it is viewed as investigatory activity or because the prosecutor sought the warrant and filed the complaint out of a wholly personal motivation unrelated to his official duties. However, we believe that securing the person of the defendant is part of initiating a prosecution and should be insulated. "Without the presence of the accused, the initiation of a prosecution would be futile." Moreover, extending absolute immunity to this function is consistent with the public policy and common law considerations outlined in *Imbler.* ... In addition, the judicial process is available to help safeguard the ultimate interests of the accused. Indeed, in this case the charges were dismissed upon preliminary examination by the [Michigan] circuit court.

795 F.2d at 555–56 (citations omitted).

Turning to the instant matter, *Imbler* appears to support Defendants' contention that they are entitled to absolute immunity, and the Sixth Circuit's ruling in *Joseph* further strengthens that contention. Just as in *Joseph,* Plaintiff bases her § 1983 suit upon a claim that the Defendants knowingly sought an arrest warrant without probable cause. Accordingly, Defendants Thompson and Tunis assert that they are absolutely immune from suit under § 1983 for their decision to file a criminal complaint and seek an arrest warrant. Next, although Defendant Meiers is an investigator rather than a prosecutor, he contends that the Supreme Court's functional approach leads to the conclusion that he also is entitled to absolute immunity, because Plaintiff's only claims against him arise from his involvement in filing the complaint and seeking the arrest warrant.

However, Plaintiff submits that two obstacles stand in the way of this Court's straightforward application of *Joseph* to the instant matter. First, given the Supreme Court's holding in *Malley,* and particularly in light of Justice Scalia's analysis in his separate opinion in *Burns,* Plaintiff challenges the continuing vitality of the Sixth Circuit's decision in *Joseph.*[7] Yet, courts have continued to cite *Joseph* and reach the same result notwithstanding *Burns* and *Malley.* For example, in *Kulwicki v. Dawson,* 969 F.2d 1454, 1463–64 (3d Cir.1992), the Third Circuit found that a county district attorney was absolutely immune from suit despite the claim that he had initiated criminal charges out of "purely political motives." Although the court noted that the circumstances surrounding the filing of criminal charges were "not above suspicion," the court concluded that "[c]onsideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity." 969 F.2d at 1464; *see also Schrob v. Catterson,* 948 F.2d 1402, 1412–17 (3d Cir.1991) (finding, despite *Burns,* that a prosecutor seeking a seizure warrant is performing an advocacy function, and thus is entitled to absolute immunity). *But see Kohl v. Casson,* 5 F.3d 1141, 1145–46 (8th Cir.1993) (finding that *Burns* dictates that a prosecutor enjoys absolute immunity for appearing before a magistrate to seek an arrest warrant, but not for advising a police officer on preparing an affidavit in support of the warrant or for presenting the affidavit as true to the magistrate).

---

7. The decision in *Malley* actually was handed down prior to the decision in *Joseph,* as shown by *Joseph* 's citation to *Malley* in support of the proposition that immunity should be conferred by function rather than status. *See Joseph,* 795 F.2d at 554. However, the *Joseph* court did not discuss the possible relevance of *Malley* to its decision that the defendant prosecutors enjoyed absolute immunity for their procurement of arrest warrants.

Moreover, Justice Scalia's separate opinion in *Burns* considered an alleged constitutional violation in a prosecutor's procurement of a *search* warrant rather than an *arrest* warrant. Justice Scalia explained the importance of this distinction to his view that *Malley* rather than *Imbler* controlled the availability of absolute immunity:

It could be argued ... that a prosecutor's role in seeking a search warrant is akin to a prosecutor's role in seeking an indictment, and thus that *Imbler*'s holding alone governs the present suit. But insofar as the *relevant* factors are concerned, this case is further from *Imbler* than was *Malley*, which denied absolute immunity to a policeman for procuring an arrest warrant. *Imbler* recognized absolute immunity out of a desire to protect actions "intimately associated with the judicial process." *Malley* rejected a further extension because the act of procuring an arrest warrant "is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment." The act of procuring a mere *search* warrant is further removed still.

*Burns*, 500 U.S. at 505, 111 S.Ct. at 1949 (Scalia, J., concurring in part and dissenting in part) (emphasis in original) (citations omitted); *see also Joseph*, 795 F.2d at 556 (finding that the prosecutors' entitlement to absolute immunity for procuring a search warrant required a "factual inquiry" that was unnecessary to the court's immunity analysis regarding the prosecutors' procurement of an arrest warrant). In contrast, Plaintiff's § 1983 suit, like the claim in *Joseph*, complains of improprieties in Defendants' filing of a criminal complaint and procurement of an arrest warrant. Thus, Defendants' actions here are more closely associated with the judicial process than the prosecutor's actions analyzed by Justice Scalia in *Burns*.

Next, Plaintiff attempts to distinguish her claim from the claim considered in *Joseph* by alleging that the arrest warrant, apart from being obtained without probable cause,[8] was issued by a court without jurisdiction. Because the Supreme Court has clearly stated that absolute prosecutorial immunity from § 1983 suits is principally intended to protect the judicial process, Plaintiff infers that Defendants are not entitled to absolute immunity for obtaining an arrest warrant from Judge Kuhn "outside the judicial process." However, this Court's prior opinion granting Defendant Kuhn's motion for summary judgment indicated that Michigan law appears to authorize circuit courts to issue arrest warrants. Moreover, in that opinion, this Court flatly rejected Plaintiff's contention that the case of *People v. Farmilo*, 137 Mich.App. 378, 358 N.W.2d 350 (1984), conclusively demonstrates that Michigan circuit court judges lack the discretionary power to entertain requests for arrest warrants. Finally, in support of his motion for summary judgment, Defendant Kuhn pointed out that the longstanding practice of Chief Judges of the Oakland County Circuit Court to issue arrest warrants has never been found to violate Michigan law. Accordingly, the Court finds that Defendants did not act "outside the judicial process" when they sought an arrest warrant from Judge Kuhn.

■ Having rejected Plaintiff's arguments to the contrary, the Court concludes that *Joseph* controls the instant matter. It remains to apply the principles established in that case to the facts of this one. *Joseph* unquestionably dictates that Defendant Thompson is absolutely immune from Plaintiff's claims. In *Joseph*, the prosecutors allegedly acted in conjunction with the police

---

8. Plaintiff also seems to believe that her claim is somehow distinguishable from *Joseph* solely by virtue of her allegation that the complaint filed by Defendants failed to state probable cause for her arrest, and thus violated the Fourth Amendment. This assertion, however, is fundamentally at odds with the concept of absolute immunity, which, when it applies, invalidates a § 1983 claim *regardless* of the motives or improper acts of the prosecutor. For example, in *Joseph*, the prosecutors were charged with knowingly using false statements to obtain arrest warrants. 795 F.2d at 555. Surely these allegations, if true, would cast doubt on the legitimacy of the warrants that subsequently were issued, and would undermine any claim that those warrants were supported by probable cause. Yet, the *Joseph* court nonetheless found that the prosecutors were entitled to absolute immunity, because they were engaged in the initiation of a prosecution. 795 F.2d at 555.

to coerce false statements that were subsequently used to obtain arrest warrants, yet the court still found that the decision to seek the warrants was protected by absolute immunity. *Joseph*, 795 F.2d at 551, 555. Here, in contrast, Defendant Thompson's involvement in the investigation was limited to high-level and remote review of its progress. At most, Plaintiff alleges, without any evidentiary support, that Defendant Thompson acted from improper political motives when he allegedly determined that his office should investigate Plaintiff's involvement in the payments to Carlin[9] and agreed that the investigation had produced enough evidence to support procurement of an arrest warrant. Moreover, the charges against Defendant Thompson in Plaintiff's complaint all arise from his involvement in the decision to seek an arrest warrant.

Accordingly, because Plaintiff has offered no evidence of any wrongdoing by Defendant Thompson in the investigation preceding Plaintiff's arrest, and because the record reveals that he played only a high-level supervisory role in that investigation, the Court finds that any possible claims against Defendant Thompson are based entirely on his participation in the decision to seek an arrest warrant. *Joseph* dictates that this decision by a prosecutor is part of the initiation of a prosecution, and thus is protected by absolute immunity. Therefore, Plaintiff cannot sustain her § 1983 claims against Defendant Thompson.

■ Defendant Tunis' claim that he enjoys absolute immunity presents a closer question. He clearly was involved in the investigation, and as it proceeded he periodically met with the investigators, including Defendant Meiers. Thus, his involvement in procuring an arrest warrant—and, in particular, his acts of drafting and signing the criminal complaint—could be viewed as either the conclusion of his investigatory role or the commencement of his advocacy role. Yet, the claims asserted against Defendant Tunis in Plaintiff's complaint concern only his participation in the allegedly tainted process of

preparing a criminal complaint and seeking an arrest warrant. Moreover, as with Defendant Thompson, Plaintiff raises only the most oblique allegations, unsupported by evidence, that Defendant Tunis' conduct during the investigation might somehow have been affected by political or face-saving motives. The Court finds, therefore, that Plaintiff's claims against Defendant Tunis are based on activities he performed in his role as advocate for the State as opposed to his investigatory role. Because Defendant Tunis is, in essence, being charged with improper initiation of a prosecution, the Court concludes that he is entitled to absolute immunity from Plaintiff's claims.

■ However, the Court disagrees with Defendant Meiers' assertion that he too is entitled to absolute immunity. While it is true that Plaintiff's complaint alleges only that Defendant Meiers participated in preparation of an improper criminal complaint and procurement of an invalid warrant, and not that his actions during the course of the investigation were improper, Defendant Meiers did not play the dual role that Defendant Tunis did. Instead, Defendant Meiers performed only investigative duties during the entire course of events leading up to Plaintiff's arrest. Accordingly, the Supreme Court's functional approach to determining the availability of absolute immunity dictates that Defendant Meiers does not enjoy such immunity.

Defendants' attempt to bring Defendant Meiers within the ambit of prosecutorial immunity is unavailing. Essentially, Defendants argue that Defendant Meiers played only a "rubber-stamp" role in the procurement of the warrant, because he acted entirely under the direction of Defendant Tunis in signing the complaint and swearing to the truth of its contents before Judge Kuhn. However, Defendant Meiers can hardly claim to be equivalent to a "man off the street" in the process of applying for a warrant. Surely Defendant Tunis' selection of Defendant Meiers to sign the complaint and appear before Judge Kuhn was informed by Defen-

---

9. The parties dispute the timing of the commencement of the Prosecutor's Office investigation. Defendants contend that the investigation

began only after Plaintiff requested it, while Plaintiff asserts that it began somewhat earlier.

dant Meiers' knowledge gained pursuant to his role as investigator. Defendant Meiers' involvement in the procurement of an arrest warrant, therefore, is much more akin to the police officer's actions in *Malley* than to the prosecutor's decisionmaking in *Joseph.* Accordingly, the Court finds that Defendant Meiers does not enjoy absolute immunity from Plaintiff's § 1983 suit.

In summary, the Court holds that Plaintiff cannot sustain her § 1983 claims against Defendants Thompson and Tunis, because their involvement in the process of obtaining an arrest warrant is protected by absolute immunity. However, Defendant Meiers is not entitled to absolute immunity, because he acted as an investigator in that process. Accordingly, the Court proceeds to consider whether qualified immunity suffices to defeat Plaintiff's claims against Defendant Meiers.

## C. *Defendant Meiers is Entitled to Qualified Immunity from Plaintiff's § 1983 Claims*

In *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Supreme Court, having first determined that the defendant police officer did not enjoy *absolute* immunity from a § 1983 suit based on his alleged procurement of an arrest warrant without probable cause, considered the scope of the officer's *qualified* immunity. The Court adopted the "objective reasonableness" standard previously applied in the context of suppression hearings. 475 U.S. at 344, 106 S.Ct. at 1097–98. This rule eschewed any subjective inquiry into the police officer's motives, and instead dictated that the officer would be subject to a § 1983 suit only "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." 475 U.S. at 341, 106 S.Ct. at 1096. In other words, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." 475 U.S. at 344–45, 106 S.Ct. at 1098 (citations omitted).

The Supreme Court further developed this "objective reasonableness" standard in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In that case, the Court held that an FBI agent who conducted a warrantless search of a home despite the alleged lack of probable cause or exigent circumstances could nonetheless prevail in a motion for summary judgment if, "in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search of the ... home was lawful." 483 U.S. at 641, 107 S.Ct. at 3040. The Court reiterated that qualified immunity rests upon "objective legal reasonableness," and stated that allegedly unlawful official action must be "assessed in light of the legal rules that were 'clearly established' at the time it was taken." 483 U.S. at 639, 107 S.Ct. at 3038 (citations omitted).

The *Anderson* Court then emphasized the importance of properly characterizing the "clearly established principle" at issue in a § 1983 suit. In particular, the Court noted that a plaintiff cannot prevail simply by claiming that the defendant violated some "clearly established" but abstract right, such as the general Fourth Amendment right to be free from unreasonable searches or seizures:

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted).

The Sixth Circuit has also considered what it means for a right to be "clearly established." In *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171 (6th Cir.1988), the court stated:

[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

858 F.2d at 1177; *see also Thomas v. Whalen,* 51 F.3d 1285, 1290 (6th Cir.1995).

■■■■ The *Seiter* court also discussed the burdens of pleading and proof when a defendant raises a qualified immunity defense. Once such a defense has been asserted, the plaintiff must come forward with sufficient factual allegations to sustain a conclusion that the defendant violated clearly established law. 858 F.2d at 1174. Next, although qualified immunity is an affirmative defense, the defendant need not prove that no clearly established law was violated; rather, "the district court must decide the purely legal question of whether the law at the time of the alleged action was clearly established in favor of the plaintiff." 858 F.2d at 1174 (quoting *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987)).

This Court recently addressed the defense of qualified immunity in a case in which state troopers allegedly used excessive force during the arrest of an intoxicated driver by handcuffing him too tightly. *Nemeckay v. Rule,* 894 F.Supp. 310, 312 (E.D.Mich.1995). In particular, this Court discussed the proper identification of the "clearly established right" at issue in that case:

Certainly, [the driver] had a clearly established right to be free from the excessive use of force in his arrest. However, as *Anderson* indicates, this does not end the inquiry. Rather, this Court must ask whether [the troopers] had reason to know that, under the circumstances of this particular arrest, failure to heed [the driver's] complaints [about the overly-tight handcuffs] could be considered an excessive use of force.... [I]f reasonable officers could disagree on whether Defendants' failure to loosen the handcuffs was excessive force, [the troopers] are entitled to qualified immunity.

894 F.Supp. at 316–17. Similarly, in the instant case, this Court must first ascertain the nature of the "clearly established right" that Defendant Meiers allegedly violated.

■■■■ Plaintiff first argues that the right at issue in this case is her right to be free from arrest without probable cause. This argument merits only cursory treatment. As the Supreme Court pointed out in *Anderson,* and as this Court reiterated in *Nemeckay,* the "objective reasonableness" test is rendered meaningless when the right allegedly violated is stated at this level of generality.

Instead, the proper inquiry in this case focuses on whether any reasonably competent investigator in Defendant Meiers' position would have concluded, in light of the preceding investigation and the criminal complaint presented to him by Defendant Tunis, that an arrest warrant should not be sought. As the Seventh Circuit has explained, this inquiry is "bifurcated" in nature: this Court "must ascertain the facts of which [Defendant Meiers] was aware, but it is beside the point whether he believed those facts added up to probable cause." *Juriss v. McGowan,* 957 F.2d 345, 349 (7th Cir.1992). In other words, the only "subjective" aspect of the "objective reasonableness" test in this case concerns the state of Defendant Meiers' factual knowledge at the time the arrest warrant was sought. The test then requires asking whether a reasonably competent investigator armed with this knowledge could have acted as Defendant Meiers did. If so, Defendant Meiers would be shielded by qualified immunity.

This Court finds that the participation of Defendant Meiers in the procurement of an arrest warrant was objectively reasonable; given what he knew from the investigation, it is far from "obvious that no reasonably competent officer would have concluded that a

warrant should issue." *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096. The Fourth Amendment, of course, requires that no arrest warrant be issued without probable cause. In turn, probable cause is defined as those "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir.1988) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979)). In the context of a qualified immunity determination, this Court need not find that probable cause actually existed to issue an arrest warrant, nor that Defendant Meiers so believed, but only that "officers of reasonable competence could disagree" on the existence of probable cause. *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096.

At the time the warrant was sought, Defendant Meiers, as part of the investigative team, presumably knew that Carlin had received payments directly from the City of Rochester Hills, that Plaintiff herself signed the overtime slips pursuant to which Carlin was paid by the City, that the budget submitted by Plaintiff did not advise the City Council of those payments, and that it was at least open to dispute whether the Sheriff's Department had authorized the direct City payments to Carlin. Viewing these facts in light of Michigan law requiring that deputy sheriffs be paid by the counties for which they work, this Court concludes that a reasonably competent officer could have found that probable cause existed to criminally charge Plaintiff for her involvement in an allegedly illegal diversion of City funds to Carlin. Consequently, Defendant Meiers acted within the bounds of "objective reasonableness"

when, based upon his knowledge of the facts uncovered during the investigation of the payments to Carlin, he sought a warrant for Plaintiff's arrest.

Notwithstanding this apparent reasonableness, Plaintiff argues that Defendant Meiers should forfeit the shield of qualified immunity because of two alleged defects in the process of obtaining a warrant for Plaintiff's arrest. First, Plaintiff contends that the criminal complaint prepared by Defendants and used to obtain the warrant contained insufficient facts to establish probable cause. Plaintiff points out that only two of the eight counts in the complaint include supporting facts, and argues that even those facts fail to establish probable cause to believe that the charged offenses actually were committed. According to Plaintiff, the patent inadequacy of this complaint renders any reliance upon it by Defendant Meiers objectively unreasonable. Next, because Defendant Meiers did not prepare the criminal complaint, Plaintiff infers that he lacked personal knowledge of the allegations it contained. Given this lack of knowledge, Plaintiff asserts that Defendant Meiers acted unreasonably by signing the complaint and·blindly swearing to the truth of its allegations.[10]

Regarding Plaintiff's first argument, Plaintiff directs the Court's attention to no case holding that a failure to recite facts supporting each individual count renders a criminal complaint legally deficient, nor has the Court's research located such a case. Instead, although the Supreme Court has held that "a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause," *Franks v. Delaware*, 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978), and that "[s]uffi-

10. Plaintiff also contends that three other deficiencies in the process of securing the arrest warrant render Defendant Meiers' participation in that process objectively unreasonable. The first two of these additional allegations—*i.e.*, that the complaint was not sworn to under oath and that Judge Kuhn failed to hold a hearing before issuing the warrant—are refuted by Defendants' deposition testimony, and Plaintiff has responded with no evidence that casts doubt on this testimony.

Plaintiff's final allegation of a procedural deficiency—*i.e.*, that Defendants presented the complaint to a court lacking jurisdiction to issue warrants—has already been rejected in the Court's analysis of absolute immunity. Moreover, for purposes of qualified immunity, even if Judge Kuhn lacked the power to issue warrants, Defendant Meiers would be entitled to rely on longstanding practice to the contrary to establish the reasonableness of seeking a warrant from Judge Kuhn. Plaintiff has pointed to no "clearly established law" that indicates otherwise.

cient information must be presented to the magistrate to allow that official to determine probable cause," *Illinois v. Gates,* 462 U.S. 213, 239, 103 S.Ct. 2317, 2333, 76 L.Ed.2d 527 (1983), the Court has emphasized the "flexible" and "common-sense" rather than "technical" nature of a probable cause inquiry. *Gates,* 462 U.S. at 239–41, 103 S.Ct. at 2333. Accordingly, Defendant Meiers' reliance on the complaint at issue here appears to violate no "clearly established" legal principle.

Moreover, Plaintiff has not challenged Defendants' assertion that the complaint in question fully complied with the requirements of the applicable Michigan court rules and statutes. This compliance suggests that a reasonably competent investigator could have relied on the complaint notwithstanding its failure to state or restate supporting facts under each individual count.[11] Finally, the facts provided in the complaint, although not included under each individual count, appear in their totality to lay a sufficient foundation for the claim that Plaintiff paid city funds to Captain Carlin without proper authorization from the Rochester Hills City Council, in contravention of the terms of the City's contract for law enforcement services, and in violation of a Michigan statute dictating how deputy sheriffs are to be paid. The Court, therefore, finds that a reasonably competent investigator in Defendant Meiers' position could have concluded that the complaint adequately stated probable cause to arrest Plaintiff. Indeed, Judge Kuhn so found when presented with the complaint.[12]

The Court also rejects Plaintiff's argument that Defendant Meiers unreasonably acted with a lack of personal knowledge when he signed the complaint.[13] Plaintiff once again fails to cite a case that suggests that this alleged lack of knowledge renders Defendant Meiers' actions legally suspect. Indeed, this Court finds that case law suggests exactly the opposite. For example, in *Bennett v. City of Grand Prairie,* 883 F.2d 400, 410 (5th Cir.1989), the Fifth Circuit found that a police officer enjoyed qualified immunity for signing and presenting an affidavit to a magistrate despite his lack of personal knowledge of the facts contained in the affidavit. Although a fellow officer had prepared the affidavit and the signing officer had not participated in the investigation, the court held that "an officer who has no personal knowledge of facts asserted in an affidavit [may] rely on information provided by another officer to file a warrant application." 883 F.2d at 410. Similarly, in the instant case, Defendant Meiers properly could have relied on information provided by Defendant Tunis to the extent that he personally lacked knowl-

11. However, Defendants are incorrect in their assertion that this compliance *conclusively proves* that Defendant Meiers' reliance on the complaint was objectively reasonable. At the hearing on Defendants' and Plaintiff's cross-motions for summary judgment, counsel for Defendants strenuously argued that the criminal complaint's technical compliance with the applicable Michigan rules and statutes insulates the complaint from Plaintiff's attack. This argument is completely *without merit,* because *content* rather than *form* ultimately determines the reasonableness of Defendant Meiers' reliance on the complaint. *Malley* clearly shows that a police officer would forfeit the protection of qualified immunity if, for example, the officer's warrant application relied solely on known falsehoods and the officer possessed no other knowledge that might establish probable cause. This result would be utterly unaffected by the officer's showing that the warrant application conformed to technical rules.

12. Contrary to Defendants' assertion, this determination by Judge Kuhn is not dispositive, because the objective reasonableness of Defendants' actions is a legal question to be resolved by this Court. *See Jeffers v. Heavrin,* 10 F.3d 380, 381 (6th Cir.1993) ("Reasonableness is a question of law to be decided by the trial judge.") Though Judge Kuhn's decision is entitled to some weight, the reasonableness question faced by this Court is analytically distinct from Judge Kuhn's determination that the complaint stated probable cause to issue an arrest warrant. *Cf. Malley,* 475 U.S. at 344 n. 7, 106 S.Ct. at 1098 n. 7 (rejecting an argument that the police officer was shielded from liability "because the judge's decision to issue the warrant [broke] the causal chain between the application for the warrant and the improvident arrest").

13. This assumes that Plaintiff could establish Meiers' lack of personal knowledge, a highly problematic assumption. Plaintiff attempts to establish this lack of knowledge by citing deposition testimony in which Meiers concedes that he played no role in the drafting of the complaint. Yet, this in no way supports the inference that he lacked personal knowledge of the factual basis for the charges lodged in the complaint. Indeed, his role as an investigator involved from the inception of the Prosecutor's Office probe of the payments to Carlin suggests quite the contrary.

edge of the facts included in the complaint. Moreover, Defendant Meiers' alleged lack of personal knowledge, even if true, would not bear on this Court's inquiry whether the criminal complaint is so lacking in probable cause that its use to obtain an arrest warrant would be objectively unreasonable.

Plaintiff attempts to rescue this argument by directing the Court's attention to the case of *Davison v. Frey,* 837 F.Supp. 235 (E.D.Mich.1993). However, the Court finds that case readily distinguishable from the instant matter. In *Davison,* the court held that a prosecutor who signed an affidavit in support of a search warrant was not entitled to summary judgment based on a defense of qualified immunity. 837 F.Supp. at 239. Essential to that determination, though, was the plaintiffs' contention that the affidavit contained "false and reckless assertions." 837 F.Supp. at 239. The court noted that an official seeking a search warrant loses the shield of qualified immunity when he "omits material facts, knowingly and intentionally makes false statements, or makes false statements with a reckless disregard for the truth in an affidavit in support of the warrant." 837 F.Supp. at 239. Upon finding that a factual dispute remained concerning the truthfulness of the prosecutor's affidavit, the court concluded that summary judgment was inappropriate. 837 F.Supp. at 239.

Plaintiff contends that *Davison* is relevant to the instant case because Defendant Meiers acted with "reckless disregard for the truth" by signing a complaint that included facts of which he had no knowledge. However, Plaintiff has not alleged that the complaint included any false statements or omitted any material facts that might have affected Judge Kuhn's decision to issue a warrant. Rather, Plaintiff alleges, in essence, that Defendants' judgment was impaired by improper motives when they concluded that they possessed

sufficient information to seek a warrant for Plaintiff's arrest. This concern about faulty judgment, however, is precisely one of the reasons why probable cause determinations are subject to independent review by a magistrate. In contrast, where a supporting affidavit or complaint includes false statements, independent review is rendered ineffective. *See Franks v. Delaware,* 438 U.S. 154, 164–65, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). The Court thus finds a rather large distinction between the allegedly false statements made by the prosecutor in *Davison* and Defendant Meiers' proper reliance on information from Defendant Tunis to the extent that he might have lacked personal knowledge of each and every fact included in the complaint. Because Plaintiff has produced absolutely no evidence to suggest that Defendant Meiers knew, or even had grounds to suspect, that any of the information contained in the complaint was false, the Court finds *Davison* inapposite to the instant matter.[14]

Finally, Plaintiff argues that the rulings of Michigan District Court Judge Nelson conclusively establish that Defendants' actions were objectively unreasonable. Judge Nelson's dismissal of the charges against Plaintiff after a preliminary hearing establishes nothing of relevance to the instant inquiry. First of all, the determination after a hearing that the prosecutor had not established probable cause to go forward with the charges does *not* mean that probable cause was lacking to make the initial arrest. *See Marx v. Gumbinner,* 905 F.2d 1503, 1507 (11th Cir. 1990) ("That a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself."). To find otherwise would ignore the very purpose for holding a preliminary hearing prior to going forward with a prosecution.[15] *See Williams*

14. In fact, another part of *Davison* actually supports this Court's conclusion that Defendant Meiers is entitled to qualified immunity, because that court, like this one, recognized that "a dispute as to the existence of probable cause is all that is needed in order to establish qualified immunity for an official who obtained a ... warrant." 837 F.Supp. at 239.

15. It is worth noting that, after *four days* of testimony, Judge Nelson found that "certainly it was a most difficult case." (Plaintiff's Brief in Support of Motion for Summary Judgment, Ex. 3, at 8). Moreover, Judge Nelson appeared to primarily base his judgment on his evaluation of the credibility of witnesses who testified at the preliminary hearing. Such witness evaluations are, of course, unavailable to judges or magis-

*v. Kobel,* 789 F.2d 463, 469 (7th Cir.1986) (noting that, under Illinois law, "[a] finding of no probable cause at a preliminary hearing ... may very well be made, and often is made, even though there *was* probable cause to arrest the defendant").

Moreover, even if Judge Nelson's dismissal of the charges amounted to a finding that probable cause for an arrest was lacking, such a finding would not defeat Defendant Meiers' claim of qualified immunity. The Sixth Circuit has unequivocally stated that "probable cause determinations, even if wrong, are not actionable as long as such determinations pass the test of reasonableness." *Jeffers v. Heavrin,* 10 F.3d 380, 381 (6th Cir.1993). Therefore, neither Judge Nelson's dismissal of the charges nor his ruling that the procedure followed to obtain the warrant violated the Fourth Amendment affects this Court's inquiry into the objective reasonableness of Defendants' actions.

In short, the Court finds that Defendant Meiers is entitled to qualified immunity for his participation in the procurement of the warrant for Plaintiff's arrest. His involvement in that process was objectively reasonable and violated no clearly established law. Accordingly, Plaintiff cannot sustain her § 1983 claims against Defendant Meiers.

## V. CONCLUSION

Because Defendants Thompson and Tunis enjoy absolute immunity from Plaintiff's § 1983 suit, and because Defendant Meiers enjoys qualified immunity from that suit, the Court concludes that Defendants are entitled to summary judgment. This conclusion necessarily implies that Plaintiff's motions for summary judgment and to compel discovery must be denied.

· For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment

trates in their determinations whether probable

and Motion to Compel Discovery be DENIED.

cause exists to issue arrest warrants.